**Brenda EVANS et al., Plaintiffs,**

v.

**Madeline BUCHANAN et al., Defendants.**

**Civ. A. Nos. 1816–1822.**

United States District Court,
D. Delaware.

May 5, 1978.

---

Joseph A. Rosenthal and Irving Morris, of Morris & Rosenthal, and Louis L. Redding, Wilmington, Del., for individual plaintiffs.

Richard Allen Paul, of Paul, Lukoff & Hurley, Wilmington, Del., for intervening plaintiffs; Louis R. Lucas, Ratner, Sugarmon, Lucas, Salky & Henderson, Memphis, Tenn., Paul R. Dimond, of O'Brien, Moran & Dimond, Ann Arbor, Mich., William L. Taylor, Center for National Policy Review, Washington, D. C., of counsel.

Aida Waserstein, Wilmington, Del., for intervening Hispanic plaintiffs.

Richard R. Wier, Jr., Atty. Gen., State of Delaware, and Regina M. Small, Asst. Atty. Gen., State of Delaware, William Prickett, and Mason E. Turner, of Prickett, Ward, Burt & Sanders, Wilmington, Del., Philip B. Kurland, Chicago, Ill., for defendant State Board of Education.

Edward W. Cooch, Jr., of Cooch & Taylor, Wilmington, Del., for Marshallton-McKean School District.

Samuel R. Russell, of Biggs & Battaglia, Wilmington, Del., for Alexis I. duPont School Dist.

Willaim Poole, of Potter, Anderson & Corroon, Wilmington, Del., for Alfred I. duPont School Dist.

James T. McKinstry, of Richards, Layton & Finger, Wilmington, Del., for Claymont and Stanton School Districts.

John P. Sinclair, of Potter, Anderson & Corroon, Wilmington, Del., for Newark School Dist.

Jerome O. Herlihy, of Herlihy & Herlihy, Wilmington, Del., for Conrad Area School Dist.

Howard M. Handelman, and Jeffrey M. Weiner, of Bayard, Brill & Handelman, Wilmington, Del., for New Castle County Vocational-Technical School Dist.

James M. Tunnell, Jr., and Richard Allen, of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for Mount Pleasant School Dist.

David Anderson, of Potter, Anderson & Corroom, Wilmington, Del., for New Castle-Gunning Bedford School Dist.

Thomas S. Lodge, of Connolly, Bove & Lodge, Wilmington, Del., for DeLaWarr School Dist.

Henry N. Herndon, and Edward M. McNally, of Morris, James, Hitchens & Williams, Wilmington, Del., for New Castle County Planning Bd. of Ed., a non-aligned party.

Leonard L. Williams, and George E. Evans, Wilmington, Del., for Wendell Howell, member of New Castle County Planning Bd. of Ed.

Sheldon N. Sandler, of Bader, Dorsey & Kreshtool, Wilmington, Del., amicus curiae, Delaware State Ed. Association.

Clifford B. Hearn, of Balick & Hearn, P.A., Wilmington, Del., amicus curiae, Wilmington Federation of Teachers AFT AFL-CIO.

## OPINION

MURRAY M. SCHWARTZ, District Judge.

The latest development in this actively litigated school desegregation case [1] is the State Board's [2] motion for a permanent injunction seeking to enjoin the NCCPBE [3] from "fixing, levying or collecting a local tax for current operating expense in excess of the limit established by applicable State law." [4] By applicable State law, the State Board refers to Senate Bill 457 ("S.B. 457"), enacted by the Delaware Legislature on February 9, 1978, which directs the State Board to set a maximum tax rate for "each new [school] district." [5] The question before the Court is whether S.B. 457 as implemented by the State Board provides a taxa-

---

1. The most recent phase of this litigation commenced in 1971. Since that time there have been numerous published opinions or orders: *Evans v. Buchanan*, 379 F.Supp. 1218 (D.Del. 1974); *Evans v. Buchanan*, 393 F.Supp. 428 (D.Del.1975); *Buchanan v. Evans*, 423 U.S. 963, 96 S.Ct. 381, 46 L.Ed.2d 293 (1975); *Buchanan v. Evans*, 423 U.S. 1080, 96 S.Ct. 868, 47 L.Ed.2d 91 (1976); *Evans v. Buchanan*, 416 F.Supp. 328 (D.Del.1976); *Delaware State Board of Education v. Evans*, 429 U.S. 973, 97 S.Ct. 475, 50 L.Ed.2d 579 (1976); *Evans v. Buchanan*, 424 F.Supp. 875 (D.Del.1976); *Evans v. Buchanan*, 555 F.2d 373 (3d Cir. 1977); *Evans v. Buchanan*, 435 F.Supp. 832 (D.Del. 1977); *Evans v. Buchanan*, 447 F.Supp. 982 (D.Del. Jan. 9, 1978); *Evans v. Buchanan*, 447 F.Supp. 1041. (D.Del. March 15, 1978).

2. The State Board refers to the defendant, the State Board of Education of the State of Delaware.

3. The NCCPBE is a five member school board appointed by defendant State Board of Educa-

tion pursuant to an August 5, 1977 Order of this Court. It is charged with the responsibility of planning for and operating a unitary racially nondiscriminatory school system within the desegregation area comprising eleven formerly separate school districts.

4. Doc. 757.

5. Although "applicable State law" is readily identifiable, the "limit established" thereby has exhibited a chameleon quality. S.B. 457 does not establish a numerical limit but merely sets forth a formula for use by the State Board in determining a maximum rate. Because both the methodology and the variables employed within the formula are subject to various interpretations, determination of the "limit established by applicable State law" is the subject of considerable dispute among the parties. The Court, however, is not required to resolve these differences.

tion scheme likely to frustrate or imperil the desegregation process in the single school district. It is concluded that question must be answered affirmatively and consequently no injunction will issue.

### I. *Jurisdiction*

On January 9 and 20, 1978, this Court issued comprehensive orders and opinions in this case. The orders conferred upon the NCCPBE the authority to establish, levy and collect taxes for current operating expenditures up to a maximum authorized rate of $1.91 per $100 of assessed valuation. The January 9 Opinion indicated that the Delaware Legislature could raise or lower the tax authorization, so long as the rate was not lowered "below a generally acceptable rate to a point at which the desegregation process would be imperiled . . . ."[6] The accompanying Order did not address this point. Defendants appealed from both the January orders and opinions. Subsequently, the Legislature responded to the invitation in the January 9 Opinion and passed legislation leading to a lower tax ceiling than that imposed by the Court.

▆▆▆ Before evaluating the merits of that legislation under the standard imposed in the January 9 Opinion, the Court must first be assured that it possesses jurisdiction to conduct such an inquiry. The appeals taken divested the Court of jurisdiction to resolve issues finally decided by the Opinion and Order. *Plant Economy Inc. v. Mirror Insulation Co.*, 308 F.2d 275, 276–77 n. 7(3d Cir. 1962); *Evans v. Buchanan*, Nos. 1816–1822 (D.Del. March 15, 1978), at 1051. Nonetheless, jurisdiction remains in the Court to enforce its previously issued orders and opinions and to rule on matters left open in those rulings. *See United States v. Board of School Commissioners*, 503 F.2d 68, 81–82 (7th Cir. 1974), *cert. denied*, 421 U.S. 929, 95 S.Ct. 1654, 44 L.Ed.2d 86 (1975); *Plaquemines Parish Commission Council v. United States*, 416 F.2d 952 (5th Cir. 1969). It follows the Court necessarily retains jurisdiction to protect its decree, especially where, as in this case, jurisdiction

has expressly been retained until the transition mandated by the orders occurs and the system upon which relief is entered is operational. *Evans v. Buchanan*, Nos. 1816–1822 (D.Del. Jan. 9, 1978), at 1039; order at 16. It is concluded the Court possesses jurisdiction.

### II. *Background*

To understand the conclusion that the State Board's tax rate likely will frustrate the desegregation process, it is necessary to review the context from which the State legislation emanated. S.B. 457 was passed in conjunction with Senate Bill 456 ("S.B. 456") which attempted to eliminate the NCCPBE as the governing body of the reorganized school district and replace the single district with four autonomous districts. Pursuant to S.B. 457, the State Board immediately fixed the tax rates for current operating expenses applicable in each of the four prospective districts, ranging from 1.343 to 1.685, and sanctioned an amount for minor capital expenditures, tuition and debt service.

On February 24, on application of the NCCPBE, a temporary restraining order issued to enjoin implementation of the four district plan. After hearing and argument, and a full review of S.B. 456, it was preliminarily concluded the four district plan conflicted with the January 9, 1978 order of the Court presently on appeal to the Third Circuit. To protect its outstanding order and to prevent irreparable harm to the movant, plaintiffs and the public, a preliminary injunction and accompanying opinion issued on March 15, 1978 enjoining the State Board from further implementation of the four district plan pursuant to S.B. 456.

Although S.B. 457 also provided a mechanism for establishing a maximum tax rate for the single district, the State Board did not move to set a rate for the single district. Instead, its Director of Finance, James L. Spartz ("Spartz"), submitted by affidavit that the maximum rate for current operating expenses would be $1.527. Thereafter, the State Board sought to per-

---

**6.** *Evans v. Buchanan*, Nos. 1816–1822 (D.Del. Jan. 9, 1978), at 1026.

manently enjoin the NCCPBE from fixing a rate for current operating expenses in excess of the amount to be fixed by defendant State Board, presumably $1.527. In the interim, pursuant to the January 9, 1978 opinion of the Court, the NCCPBE on February 23, 1978 established a tax rate for current operating expenses of $1.68. This rate was within the guidelines sanctioned by the Court's order and coincidentally within the upper range of tax rates which had been established by the State Board for the aborted four district plan.[7]

In the face of the two disparate tax rates, the issue now posed for decision is whether the formula for local school funding[8] set out by the Legislature as interpreted by the State Board is an acceptable "practical alternative" or threatens to imperil the desegregation process in the coming or future years and must be rejected.

### III. *S.B. 457 and the Role of the Court*

S.B. 457 provides a procedure by which the State Board is authorized to calculate a maximum current operating expenses tax rate.[9] The legislation directs the State Board to: (1) estimate fiscal 1978 current expenditures; (2) divide this figure by the number of students enrolled for fiscal year

---

**7.** At the time the Court issued its secondary remedial opinion on January 9, 1978 approving a 9–3 pupil assignment plan for use in the single district by the NCCPBE, no statutory framework governed the imposition of local taxes necessary to finance the desegregation plan. The sole point of reference, the Delaware Educational Advancement Act, 14 *Del.C.* § 1010, provided that the power to establish a tax rate rests with the "school board of the reorganized school district" and upon that reorganization, the tax rate of the resulting district may incorporate the highest per pupil expenditure of the combined districts.

Analysis of the only data available at that time revealed widely disparate tax rates and per pupil tax bases among the eleven districts. For example, the Wilmington tax rate of $2.669 for current operating expenses was three times that of the Conrad District in 1976–77, while the assessed value of real estate per pupil in the Alexis I. District was three times that of the DeLaWarr District even though both had current operating tax rates within .0245 cents of each other. Consequently, the Wilmington and Alexis I. per pupil expenditures, each exceeding $700, were considered aberrations. For this reason, and comporting with state law to the extent possible, the Court based its calculations on data regarding the Mt. Pleasant District. Guided by historical patterns of school spending and the increases over time in that district, a per pupil expenditure figure was generated and then applied to all the children in the desegregation area. Finally a 5% increase to cover the costs of desegregation was authorized. Thus, after noting the inverse relationship between the size of pupil enrollment and state and local expenditures for public education, evaluating historical patterns of school financing and spending and anticipating the necessity to earmark some new money to cover the costs of desegregation, the Court empowered the NCCPBE to set a tax rate not in excess of $1.91 for current operating expense and $.32 for

combined tuition, minor capital expenditures and debt service.

After the January 9, 1978 opinion issued, the NCCPBE supplied more accurate data which placed Alfred I. duPont as the district with the highest per pupil expenditure outside of Alexis I. and Wilmington. Doc. 705. Use of this information did not significantly alter the outcome reached by the Court and consequently the motion for modification on this point was denied in the Court's opinion of January 20, 1978.

In the January 9, 1978 opinion, the NCCPBE was strongly "cautioned against using the full limit of its power during the early years of its governance of the single district." Specifically because the school district in the second year of desegregation would begin to assume half of the direct costs of desegregation such as ancillary relief and compensatory reading programs and in successive years would assume an increasingly greater share, the Court advised that "prudence dictates holding as much of the authorization in reserve as possible" because "additional authorization will not be granted except for unforeseen circumstances" with inflationary pressure on salaries not considered an unforseen contingency. *Evans v. Buchanan*, Nos. 1816–1822 (D.Del. Jan. 9, 1978), at 1033. Finally to provide sufficient time to enable property owners to meet their obligations, the NCCPBE was ordered to establish a local school tax rate for the single district by February 24, 1978. On February 23, the NCCPBE fixed $1.68 as the rate for current operating expenses and $.29 for the combined expenses of debt service, minor capital expenditures and tuition.

**8.** Unless otherwise indicated all dollar numbers refer to the current expense component of the local school tax, collected from assessment of real property within the desegregation area.

**9.** S.B. 457 provides in pertinent part:
"NOW, THEREFORE:

1978 to calculate a current average per pupil expenditure; (3) multiply the average expenditure total by the number of students expected to attend in fiscal year 1979 to establish an estimated expenditure required for fiscal year 1979; (4) using the current total assessed value of taxable real estate establish a tax rate that would yield 110% of the 1979 estimated expenditure. Although providing that the 110% amount so obtained included delinquencies and the costs of collection, the statute is silent on whether the 10% is also intended to cover the costs of reorganization and desegregation or is simply an inflation factor reflecting the historic percentage of increase in total expenditure. Finally, the statute provides that the Board of Education (NCCPBE) rather than the State Board may set the tax rate for debt service, minor capital expenditures and tuition.

The State Board urges that the rate obtained by it following the statutory pro-

BE IT ENACTED BY THE GENERAL ASSEMBLY OF THE STATE OF DELAWARE:

Section 1. Amend Subchapter I, Chapter 19, Title 14 of the Delaware Code, by adding a new § 1924 thereto to read as follows: . . .

(b) The Interim Board of Education or Board of Education or other authority mandated by the Court or by this Title for each reorganized school district may annually set a tax rate for current operating expenses not greater than a maximum rate to be determined by the State Board of Education in accordance with the following mathematical procedure:

(1) Determine the total aggregate dollar amount of local tax funded current operating cost expenditure in the school districts (except vocational technical school districts unless such districts are included in the consolidation) of the consolidated area in the year prior to consolidation. In determining such total amount the State Board shall take the known total aggregate dollar amount of local tax funded current operating cost expenditure in the fiscal year preceding the year prior to consolidation and shall adjust this amount to take into account historic annual percentage changes in such total dollar amounts.

(2) Calculate the average per pupil local tax funded operating cost expenditure by dividing the dollar amount determined in part (1) by the total number of students resident in the consolidated area who attend public schools of the districts (except vocational technical school districts unless such districts are included in the consolidation) within the consolidated area on September 30 of the year prior to consolidation.

(3) Multiply the per pupil figure determined in part (2) by the projected number of pupils expected to attend school in the reorganized school district in the first year of consolidation, such projected number to be determined by the State Board of Education by whatever tests or standards it finds appropriate.

(4) Determine the tax rate which, when multiplied by the total assessed value of all taxable real estate in the reorganized school district at the time the maximum is calculated, except taxable real estate which is exempt from county taxation, as determined and fixed for county tax purposes, would yield tax dollars collectible equal to 110 per cent of the total dollar amount determined in part (3).

(c) The maximum rate of tax authorized in accordance with subsection (b) hereof includes the percentage for delinquencies and costs of collection provided for in Section 1913 of this Title.

(d) The Interim Board of Education or the Board of Education or other authority mandated by the Court or by this Title for each reorganized school district may at an appropriate time during each fiscal year set a tax rate for debt service for the next fiscal year that shall be adequate to make the payments for principal and interest on debts evidenced by bonds or bond obligations of the reorganized district and bonds or bond obligations in each of the whole component school districts included in the reorganized district and for that fraction of the bond obligation of each component school district partially included in the reorganized district equal to the fraction of the assessed value (except taxable real estate which is exempt from county taxation, as determined and fixed by county tax purposes) of such partially included district located in the reorganized district.

(e) The Interim Board of Education or Board of Education or other authority mandated by the Court or by this Title for each reorganized school district may each fiscal year determine and set tax rates for tuition and for minor capital improvements for the next fiscal year. . . .

Section 2. If *Evans v. Buchanan* is reversed, in whole or in part, so that the eleven districts consolidated pursuant to the Court Order are permitted to regain their identity and status, the tax rates set by the reorganized school district or school districts shall not be authorized in the component districts, and the tax rates authorized in each of the eleven districts shall be the rates authorized prior to the consolidation, until changed pursuant to the provisions of Title 14, Chapter 19, Subchapter I. . . ."

cedure cannot be upset because "in the field of taxation . . . special deference is normally paid to legislative judgments."[10] Citing *Madden v. Kentucky*, 309 U.S. 83, 87–88, 60 S.Ct. 406, 84 L.Ed. 590 (1940), for the postulate that legislatures possess great freedom in taxation classifications, the Supreme Court stated in *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 42, 93 S.Ct. 1278, 1301, 36 L.Ed.2d 16 (1973):

> The very complexity of the problems of financing and managing a statewide public school system suggests that "there will be more than one constitutionally permissible method of solving them," and that within the limits of rationality, "the legislature's efforts to tackle the problems" should be entitled to respect. *Jefferson v. Hackney*, 406 U.S. [535, 546–47, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972)].

■■■ The inherent power of a court to take whatever steps are required to fashion an effective desegregation decree compels the conclusion that the usual presumption of deference to a legislature in taxation matters does not mandate acceptance of the State Board's maximum rate. After *North Carolina State Board of Education v. Swann*, 402 U.S. 43, 91 S.Ct. 1284, 28 L.Ed.2d 586 (1971), it may not be disputed seriously that a court has authority to strike down impediments, financial or otherwise, to an appropriate remedy for the dismantling of a dual school system.[11] As the Supreme Court observed, 402 U.S. at 45, 91 S.Ct. at 1286:

[I]f a state-imposed limitation on a school authority's discretion operates to inhibit or obstruct the operation of a unitary school system or impede the disestablishing of a dual school system, it must fall; state policy must give way when it operates to hinder vindication of federal constitutional guarantees.

The inherent power of a court in a desegregation setting necessarily encompasses assuring the collection of adequate funds to effectively operate a racially nondiscriminatory unitary school system.[12]

In *United States v. Missouri*, 515 F.2d 1365 (8th Cir.), *cert. denied*, 423 U.S. 951, 96 S.Ct. 374, 46 L.Ed.2d 288 (1975), the Eighth Circuit confronted a challenge to a tax rate authorized by a federal district court in a desegregation context. Unlike the matter *sub judice*, a higher rate had been set than existed in any of the three component districts, no meaningful effort was made to show a lower rate would be inadequate, and an apparently realistic possibility existed that additional funds could be obtained from the state legislature. Reducing the rate set by the district court to the highest already applicable within a component district, the circuit court reversed, noting however that: "We are satisfied that the district court had the authority to implement its desegregation order by directing that provision be made for the levying of taxes essential to the operation of the new school

10. Doc. 786 at 8.

11. *See generally* Frug, *The Judicial Power of the Purse*, 126 *U.Pa.L.Rev.* 715, 762–67 (1978) (recognizing the broad remedial power of the courts but detailing efforts to minimize federal intrusion into local affairs).

12. *See Robinson v. Cahill*, 70 N.J. 155, 358 A.2d 457, 467 (1976) (dissenting opinion):
    [The power to correct constitutional inequities] necessarily includes the authority to require the collection of revenues in cases where protection of a fundamental constitutional right depends on the availability of funds. *See, e. g., Boddie v. Connecticut*, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971); *Griffin v. School Bd. of Prince Edward Cty.*, 377 U.S. 218, 232–234, 84 S.Ct. 1226, 12 L.Ed.2d 256, 266–67 (1964); *Griffin v. Illinois*,

351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956); *United States v. Missouri*, 515 F.2d 1365, 1371–1372 (8 Cir. 1975), *cert. den.*, 423 U.S. 951, 96 S.Ct. 374, 46 L.Ed.2d 288 (1975); *Wyatt v. Stickney*, 325 F.Supp. 781, 784–785 (M.D.Ala.1971), aff'd 344 F.Supp. 373, 377 and 344 F.Supp. 387, 392 (M.D.Ala.1972), aff'd *sub nom. Wyatt v. Aderholt*, 503 F.2d 1305 (5 Cir. 1974); *Brewer v. School Bd. of Norfolk*, 456 F.2d 943, 946–948 (4 Cir. 1972), *cert. den.* 406 U.S. 933, 92 S.Ct. 1778, 32 L.Ed.2d 136 (1972); *Bradley v. Milliken*, 345 F.Supp. 914, 938 and cases cited therein (E.D. Mich.1972) aff'd 484 F.2d 215, 258 (6 Cir. 1973), rev'd on other grounds and remanded, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974).

district." 515 F.2d at 1372. Thus *United States v. Missouri* stands for the proposition that a rate established pursuant to legislative command may be invalidated if inadequate to assure effective school desegregation.[13]

Accordingly, if the record compels the conclusion that the State Board's rate jeopardizes the chances for success of the remedial scheme for redress of a constitutional violation, the requested permanent injunction against a higher maximum rate should be denied.

## IV. S.B. 457 as Implemented by the State Board

In support of its motion for a permanent injunction, the State Board initially represented that the maximum tax rate it would endorse would be $1.527.[14] However, at the close of hearings, the State Board actually set the rate at $1.585. Thus, the question presented is whether the desegregation process during the upcoming transition years will be imperiled by reason of the $1.585 current expense tax rate maximum limit established by defendant State Board

---

13. Comparison with *United States v. Missouri* is helpful in the present context for two additional reasons. First, the lower rate approved by the Eighth Circuit in *Missouri* was not the result of new legislation directed solely to a district undergoing desegregation, but rather represented the greatest rate already utilized by one of the three reorganized districts. Analogously, S.B. 457 is newly enacted legislation applicable not throughout the State of Delaware but only to the reorganized district resulting from school desegregation. Indeed, the legislation provides that it shall become a nullity if the district court decision in *Evans v. Buchanan* is reversed. Moreover, S.B. 457 represents a clear departure from prior state law. As previously rehearsed, n. *, p. 1045, *supra,* under the Delaware Educational Advancement Act a consolidated district may levy a tax up to the highest rate of any component district. Applied here, that Act would produce a maximum rate for current operating expenses of $2.669, almost a full dollar above the rate requested by the NCCPBE to which the State Board objects. This Court previously has noted the actions and omissions of the Delaware Legislature in this case. *See, e. g., Evans v. Buchanan,* Nos. 1816–1822 (D.Del. March 15, 1978), slip op. at 21 at 1050; *id.* (D.Del. Jan. 9, 1978) (detailing Legislature's continuing default), and Doc. 785 (Order of April 28, 1978 necessitated by continuing legislative refusal to pass an appropriation for purchase of buses resulting in a direction to defendant State Board of Education to sign a contract for purchase of buses so that the same would be timely delivered for the September 1978 opening of school). At this point, it suffices to say that the presumption of legislative regularity in matters of taxation that is usually accorded may be reduced when applied to newly enacted legislation significantly departing from prior State practice which legislation does not possess statewide applicability and which will self-destruct upon a particular judicial verdict in the case for which it was enacted.

A second lesson to be derived from *United States v. Missouri* is that so long as a state makes provision for sufficient funds to bankroll a desegregation remedy, that state may choose to absorb the costs itself rather than pass them on to the local district. Thus in reversing the district court in *Missouri* the Eighth Circuit very clearly relied on "receipt of anticipated funds through action of the legislature." 515 F.2d at 1373. These funds were intended to supplement those received from the reduced tax rate. In *Evans,* the Court indicated to counsel in the hearings concerning the matter *sub judice* that one alternative would be to accept the rate set by the State Board pursuant to legislative command and assess an additional amount attributable to the desegregation process directly against the State. The State Board regarded this approach as unsatisfactory. Doc. 786 at 19–21. Thus, although *Missouri* can be interpreted as the Eighth Circuit's allowing state authorities to choose how to allocate financial burdens once sufficient funds were assured, the present litigation involves only the suitability of the State Board calculated local rate, because no realistic prospect exists for supplemental State aid.

14. The amount of $1.527 was calculated in a manner which departed dramatically from the legislation. In the first place, it was based on current pupil expenditures rather than current total operating expenses as explicitly required by the statute. Second, the $1.527 rate assumed 100% collectibility and was arriving at without consideration of the prospect that increasing taxes may result in increasing delinquency. Finally application of a 10% adjustment factor is less than the roughly 13% average percentage increase in per pupil expenditure over the prior five year period. Representations that the 3% difference would be made up by an increase in the assessed value of real property were quickly disproved. NCCPBE Tax Exh. 40; State Board Tax Exh. 9. These factors combined with a mathematical error in the per pupil expenditure for 1977 had the effect of yielding a lower tax rate than would obtain by any reasonable reading of the statute.

of Education. This question is answered in the affirmative because: (1) Based upon historic levels of local support, the yield available for public education in the desegregation area from the $1.585 tax rate is less than the projected total aggregate local expenditure for school children which would have been made by the eleven component districts in the absence of reorganization and desegregation; (2) No provision was made for local current operating tax revenue to enable the NCCPBE to meet essential expenses incidental to reorganization and desegregation; (3) S.B. 457 as construed and as procedurally presented in the form of a motion for permanent injunction by the State Board would establish for all practical purposes the $1.585 limit in perpetuity notwithstanding that inflation is a fact of life and an outstanding January 9, 1978 order of this Court requires the NCCPBE to pay fifty percent of the costs of desegregation commencing in fiscal year 1980 and increasing ten percent each year thereafter; and (4) the State Board in adopting the $1.585 rate predicated the same upon an assumption which is invalid under State law. Further, it is held there is sufficient evidence in the record to substantiate imposition of the $1.68 current operating expense tax component of the local school tax rate as established.

### 1. *Historic Levels of Support*

The State Board represents that a tax rate of $1.585 assessed against the current tax base of $2,516,000,000 will yield $39,873,626.[15] But this statement assumes a totally unrealistic collection rate of 100%. Increased taxation, for many people in the neighborhood of a 50% to 90% rise in school taxes, may well lead to increased delinquencies. Even assuming the historical collec-

tion rate of 98.5%,[16] a tax of $1.585 will actually yield $39,275,521.

Arguing that the rate of $1.585 is higher than the present tax rate in ten of the eleven districts, the State also maintains that de facto it must be a "generally acceptable rate." If past spending in the individual districts were at a level equivalent to the revenues raised by their respective tax rates, the State's position might have merit. As is evident in any analysis of prior spending practices, however, a vast difference exists between revenues and expenditures in that the districts have been spending extensively out of reserves. To reverse that trend in the first year of desegregation by mandating that less money will be devoted to the education of public school children than is indicated by historical experience must be viewed skeptically as one enters the desegregation process.

Touche Ross & Co. ("Touche Ross"), a major accounting and management consultant firm hired by the NCCPBE, has demonstrated that independent of desegregation, financing the school system in a manner consistent with prior practice would require some $39,983,000 which would result if a tax rate of no less than $1.613 were levied.[17] To this amount, an additional sum must be added to encompass start up costs for the coming year and increased costs of desegregation assumed by the NCCPBE in future years.

It is obviously difficult to quantify human experience or to describe with accuracy that financial point below which desegregation would be imperiled. One can, however, say with some assurance that when less is spent on education during the first year of desegregation than would have been spent absent desegregation, the effort

---

**15.** Doc. 786 at 6.

**16.** 98.5% is the historical collection rate attested to by Touche Ross & Co. NCCPBE Tax Exh. 49. This percentage rate was not disputed by any party.

**17.** NCCPBE Tax Exh. 38; 44; 51. This projection reflects an adjustment of the actual

figures to reflect the special fuel appropriation received by the districts from the State in 1976. According to Touche Ross, this appropriation should be included because it covered a cost which the districts otherwise would incur. Projected expenditures using an unadjusted trend line are calculated at $39,108,000. NCCPBE Tax Exh. 37.

to desegregate is threatened if not imperiled.[18]

### 2. *Reorganization and Desegregation Expenses*

In July 1978, when the NCCPBE assumes full operating authority, it shall be responsible not only for the usual budget items but also for a number of other expenses. Additional personnel items, for example, include unemployment insurance which the district will be paying for the first time at an estimated amount of $420,000.[19] Likewise, under the recently passed State Budget Act, the district must now pay the increased costs of fringe benefits which are estimated at between $540,000–$720,000[20] for fiscal year 1979.

With respect to non-personnel items, the cost to the NCCPBE for its share of in-service training considered necessary to a successful desegregation effort is calculated at $545,000.[21] There are also a number of one time costs which at this point do not bear precise price tags. For example, to insure public acceptance and accountability, a full audit of both the financial and programmatic aspects of the new administration is contemplated at an estimated cost of $100,000–$150,000.[22] The negotiation of employment contracts with teachers and staff presently employed in eleven autonomous districts is estimated to cost between $100,000–$150,000.[23] The standardization of instructional materials may take "somewhere between $150,000–$200,000"[24] and moving and relocating equipment may be "something on the order of $100,000–$150,000."[25] When these costs are offset by the savings of some $630,000[26] expected to result from

the closing of some fourteen schools, the projected expenditures amount to somewhere between one and two million dollars. These figures, however imprecise, cannot be ignored totally.

Looking beyond the first year of desegregation to the start of school in 1979, additional costs loom which the tax rate does not anticipate. Under the January 9th remedial order of the Court, the State will pay in toto the costs directly related to desegregation, except for in-service training which is to be shared jointly by the State and the NCCPBE in the first year of desegregation. Latest estimates indicate that to discharge its responsibility in this regard, the State will spend approximately $8,862,000.[27] In the following year, however, the NCCPBE is expected to pay 50% of all desegregation costs. Thereafter, the NCCPBE will assume an additional 10% in each of the following five years.

Because these expenditures for human relations counsellors and the like are intended to facilitate the transition to a desegregated system, it is assumed that the starting figure of eight million dollars is a high point which will diminish over time. Nonetheless, it is not unreasonable to assume that in fiscal year 1980, the NCCPBE will be burdened by substantial costs in addition to the normal budgetary demands. One can also reasonably anticipate that the amount budgeted for 1979 will prove inadequate in fiscal year 1980 and in future years, unless the district is somehow immunized against the inflation which the rest of the world experiences.

To embark on the long overdue course of desegregation with funds which, if mini-

---

**18.** In this regard it is interesting to note that the $1.585 rate is some $.07 less than Spartz, State Director of Finance and School Services, had recommended to the Legislature at an earlier stage. Concerned that a lesser amount would undermine public education in the affected area, Spartz had suggested that the $1.65 rate was more suitable. NCCPBE Tax Exh. 5 at 4; Doc. 782 at 25–26.

**19.** Doc. 784 at 191.

**20.** *Id.* 199.

**21.** NCCPBE Tax Exh. 21 at 12.

**22.** Doc. 784 at 196.

**23.** *Id.* 197.

**24.** *Id.* 198.

**25.** *Id.* 199.

**26.** *Id.* 182.

**27.** NCCPBE Tax Exh. 21 at 9, 12.

mally sufficient to satisfy operating costs for one year, are inadequate to meet the actual costs of desegregation and reorganization is to invite disaster.

### 3. Inelasticity of the Tax Rate

Perhaps the greatest problem presented by S.B. 457 is that it yields a permanent upper limit not subject to adjustment. As previously rehearsed, the Touche Ross historical projection displays that the $1.585 rate yields a lesser amount of money in fiscal year 1979 than probably would have been received for education absent desegregation and fails to generate additional funds to cover the initial costs of desegregation and reorganization. The problem faced by the operating NCCPBE under this circumstance is that if it holds funds in reserve to meet future responsibilities as directed by the Court, it will not have sufficient monies to achieve even one year of successful desegregation. Although the Planning Board "may annually set a tax rate," it may never exceed that rate once calculated by the State Board using the legislative formula. Thus, instead of a taxation scheme, the Legislature has provided merely a tax rate frozen in time without regard to rising costs or to the requirement that the NCCPBE gradually assume a greater share of desegregation costs.

It is widely understood that the rate established by this one time calculation would be forever binding absent a referendum.[28] It is also widely acknowledged that the chances of passing a referendum are exceedingly slim.[29] An analysis of the financial needs of the new district reveals that even if the tax rate set by the State Board generated minimally sufficient income in the first year, it would be hopelessly deficient for the second year. It therefore follows that if the NCCPBE set a rate now which would hold the required amount of future desegregation costs in reserve, certain failure would be assured in the coming year.

### 4. Contrary State Law

An additional defect in the State Board interpretation is its premise that students attending special schools must be financed differently from other students in the district. A rate was set "assuming that the local share of special schools continues within the single district to be funded by a tuition tax in accordance with 14 Del.C. § 1924(e) and in accordance with prior practice." [30] This language contemplates that the operation of the five special schools will be funded out of revenues raised by the tuition tax and not out of the current operating budget.

Apart from one statutory exception providing that the cost of transportation to the special schools be derived from the tuition tax,[31] 14 Del.C. §§ 601–05 make clear that tuition charges for special education are to be assessed only between districts, i. e., the receiving district may charge tuition of the sending district. Following state law then, in a single district, the amount of tuition is considerably reduced and is used only to fund children who go out of the single district and to provide the costs of transportation to special schools.

Testimony by Dr. Madden, who drafted the relevant portions of the Delaware Code, confirmed that the practice of some districts in charging themselves tuition for special students educated within their own district runs counter not only to the language but also to the intent of the legisla-

---

**28.** As Spartz explained "[t]he rate that is computed one time based on the conditions of the legislation sets the maximum rate until changed by referendum." Doc. 782 at 44. This explanation comports with Superintendent Madden's understanding that the legislation "defines a maximum tax rate, that is the tax rate that is used in perpetuity. There is no leeway to go beyond that allowable tax rate,

unless there is a referendum by law to authorize an increase." Doc. 784 at 41.

**29.** According to Dr. Madden, "the odds against [a referendum's] passing would be almost nil." Id. 63.

**30.** State Board Tax Exh. 20.

**31.** Doc. 786, Exh. A.

tion.[32] Dr. Madden agreed that if he were to develop a taxation scheme, he would follow the practice of including the costs of running the special school within the current expense operating budget.[33] Despite this guidance, the State Board inexplicably has chosen to contravene state law by fixing a tax rate predicated upon an unlawful designation of a revenue source for payment of the cost of operation of the special schools within the single district.

In this regard, it is interesting to note that the NCCPBE, empowered by the Court to set the tuition tax, has done so at two cents per hundred, well under the five cents authorized. Some have surmised that the lower rate was adopted because the NCCPBE realized that irrespective of prior practice, students attending the special schools are required to be funded from the current operating budget and that tuition tax money could not be used for current operating expenditures of the special schools.[34] Nonetheless, if the State Board violated state law, it is possible the NCCPBE committed the same error. If so, it is expected the NCCPBE will correct the mistake.

In conclusion, the $1.585 rate, which is set in perpetuity, fails even to provide the funds that would have been spent next year on public education in the affected area absent desegregation. Moreover, it does not supply the costs of reorganization and desegregation nor respond to future needs. Finally, the rate was derived contrary to existing state law.

## V. The Rate Set by the NCCPBE is Supported by the Evidence

Preliminary budgetary analyses were conducted by Dr. Keith Stapley ("Stapley") and David Fauser ("Fauser") for the NCCPBE. Based upon the current budgets of some eight districts and the assumption that the teachers in the eleven districts would no longer work at eleven different salary scales but rather would be placed on a composite salary schedule,[35] Stapley and Fauser concluded, using both a market data retrieval approach and one based on average per pupil expenditures, that the fiscal year 1979 budget for current operating expenses would be in the neighborhood of $38.5 to $39.2 million.[36]

Elaborating on those projections, Fauser then added in some of the additional costs such as auxiliary services, moving costs, cost of assuring uniform textbooks, and costs of unemployment payments for teachers. He further considered whether the closing of some schools and the possible concomitant decrease in the number of required teachers would be reflected by normal attrition or whether some teachers would be discharged in a process known as "riffing." Taking into account savings realized by closing of schools, Fauser estimated that the budget would be $42 million and recommended that the current operating expense rate be set at $1.68.

The State Board's position essentially is that the ability to pay or not pay teachers'

32. Doc. 784 at 58.

33. *Id.* at 60.

34. Doc. 784 at 61.

35. The NCCPBE's advisors worked under several premises. First, they retained the current number of 3,958 teachers because it was at least a fact and, furthermore, in Fauser's experience, declining enrollment has not resulted in a proportionate decline of teachers. Second, the number of teachers who are supported entirely out of local funds was calculated to be an additional 180 teachers. Third, apparently on instructions from the NCCPBE, they formulated a composite salary schedule by reference to the three highest predominantly white districts, Alexis I., Alfred I. and Newark. Alternatively, they drafted a two-tier salary approach which involved retaining Wilmington teachers on their own salary schedule which is presently the highest in the desegregation area while incorporating all other teachers into the composite predominantly white district schedule. Finally, based on a rough rule of thumb learned by experience, teachers' salaries were estimated to consume 50% of the entire local budget.

It is noted defendants have supplied information revealing that the number of teachers paid exclusively from local funds at the present time is 155 and not 180 as posited by the NCCPBE's planners. State Board Tax Exh. 17.

36. NCCPBE Tax Exh. 1 (adjusted to reflect state contribution as projected by Stapley. Doc. 784 at 89–91).

salaries at a given rate has nothing to do with whether the effort to desegregate is frustrated and consequently the proper tax rate cannot be measured by this standard. Nonetheless, the State Board has taken great pains to demonstrate that the amount of revenues required to pay teachers at their current rates is adequately supplied by the some $39 million budget expected to be generated by a tax rate of $1.585.

Because the State Board's tax rate is completely controlled by its use of a vigorously contested enrollment figure [37] and its budget computations are likewise based on a considerably reduced faculty,[38] the validity of the State Board's projection is highly questionable.[39] Apart from this difficulty, all proposals of the State Board are based on the premise that teachers will continue on their present negotiated salary schedules. Accordingly, eleven different scales will govern with teachers in any one school working at several different rates of pay. This proposition, which strains human nature, is rejected as untenable by the NCCPBE which is attempting to create a composite salary scale for teachers.[40] Whatever pay scale ultimately results, it can only be expected to provide for increased costs in future years. When salary costs are viewed in conjunction with the additional costs of reorganization and desegregation, it is clear that the tax rate of $1.68 set by the NCCPBE is more responsive to the needs of the single district entering its first year of desegregation than is the $1.585 rate which would either have

37. Although the State Board maintains that in the past their projections have been "right on the nose," their enrollment figure of 65,835 is susceptible to challenge because the State has supplied different numbers at different times in a manner which suggests that the numbers are less supportive of the facts than they are of the State's litigation posture. For example, during the hearings which ended in December 1977, when the issue was whether the schools in the predominantly black districts had adequate capacity to support a 9–3 assignment plan, the State supplied a higher number. Now that the job of financing the schools is at hand, the State submits "with almost 100% accuracy" that the number of children in the schools will be only 65,835. But the September 30, 1977 enrollments from which the State Board calculated a prospective 65,835 enrollment were not only available, but were introduced into evidence at the earlier hearings. D.P.I. Exh. 4 (dated October 26, 1977); Ct. Exh. 109 (introduced Dec. 2, 1977). The State Board has offered no explanation for its enrollment discrepancy. At the same time, the Court expressly notes no cloud has been placed on the integrity of defense counsel who merely submitted data supplied by defendant State Board and hardly could be expected to possess knowledge of statistical projection techniques which their client later would use when it suited its convenience.

38. The current number of teachers is 3,958 whereas the State Board's calculation of 3,375 is based on a reduction of some 600 teachers. State Board Tax Exh. 19.

39. The 65,835 enrollment number advanced by the State was derived by use of a technique known as the cohort survival method which, roughly speaking, measures the retention or survival rate of groups of pupils as they move from one grade to another. But using the same method, Edward Ratledge of the Division of Urban Affairs, University of Delaware, arrived at a higher figure of 66,776. NCCPBE Tax Exh. 2 (adjusted to exclude 888 students at the Howard Career Center). Also, utilizing a trend line projection, Touche Ross has graphed enrollments in prior years and extrapolated that enrollment in fiscal year 1979 is likely to be 67,487. NCCPBE Tax Exh. 45. Other enrollment estimates have emanated from the Pupil Assignment Committee which worked with the figure 69,390 and Fauser, who surmised that if there were a drop in enrollment of 7–7½%, the resulting population would equal 64,584. Substituting these estimated enrollment figures in the legislative formula as interpreted by the State Board yields tax rates of $1607, $1.624, $1.67 and $1.55, respectively.

40. If the composite salary scale were based on an average of the eleven districts, 49.54% of all presently employed teachers would be expected to take a reduction in pay. NCCPBE Tax Exh. 64.

Adjusting the scale upward to reflect the three highest suburban districts' schedules would require a budget of some $39 million dollars, as calculated from NCCPBE Tax Exh. 65 in conjunction with State Board Tax Exh. 19, and would result in 20.33% of all presently employed teachers taking a reduction. NCCPBE Tax Exh. 65. If, in addition, the Wilmington teachers, presently paid at the highest rate in the county, are permitted to remain at their current salary levels, a budget of some $42 million dollars may be required, based on calculations from State Board Tax Exh. 16 in conjunction with State Board Tax Exh. 19.

teachers working side by side at different rates of pay or would necessitate reductions in salaries or educational programs.

Plaintiffs, who independently have urged a tax cap of no less than $1.65, have pointed out that possibly the roughly $2.5 million difference in yields supplied by the $1.585 tax rate fixed by the State Board and the $1.68 tax rate established by the NCCPBE will be supplied by the State. In this regard, it is telling that the State Board has not urged this argument. Likewise, the State has declined the suggestion that the proposed $1.585 be adopted with the qualification that any resulting financial insufficiencies be assumed by the State.

Plaintiffs' observation is based on the Court's order that during the transition phase, the State level of support must continue at the higher of the amount supplied in 1976–77 or 1977–78.[41] Because it appears that $84.2 million was furnished by the State in 1976–77[42] and that the NCCPBE anticipated receipt of only $80.94 million from the State in 1978–79,[43] plaintiffs suggest that appropriation of the higher amount mandated by the Court would alleviate the perceived fiscal crisis precipitated by the $1.585 rate.

An initial concern is that the level of State support recommended by the Governor for 1978–79 is the woefully deficient sum of about $76 million.[44] But assuming full compliance by the State with the Court's order and that the level of support exceeds that anticipated by the NCCPBE in its preliminary budgetary analysis, the potential financial disaster created by the $1.585 rate would not necessarily be averted. Throughout these proceedings, references to State support have borne the labels, Division I funds, Division II money, and so forth. These labels signify that State money is earmarked in such a way that flexibility in its use is severely hampered. Under these circumstances, the Court is unconvinced that current levels of State support militate in favor of one local tax rate or another.

### VI. *Conclusion*

The foregoing factors, viewed in combination in the context of school desegregation, admit of only one conclusion. If S.B. 457 and the $1.585 rate are accepted, the desegregation process will not only be imperiled but will be doomed to suffer a painful death from economic strangulation. The victims will be somewhere between 65,000 and 70,000 children.

Under these circumstances, an order will be entered denying defendants' motion for a permanent injunction. This Opinion shall constitute Findings of Fact and Conclusions of Law pursuant to F.R.Civ.P. 52.

---

41. *Evans v. Buchanan*, Nos. 1816–1822 (D.Del. Jan. 9, 1978), slip op. at 128 at 1039.

42. NCCPBE Tax Exh. 10.

43. NCCPBE Tax Exh. 21 at 9 (adjusted to exclude ancillary relief.

44. NCCPBE Tax Exh. 10; Plaintiffs Tax Exh. 1.