Brenda EVANS et al., Plaintiffs,

v.

Madeline BUCHANAN et al.,
Defendants.

Civ. A. Nos. 1816–1822.

United States District Court,
D. Delaware.

June 22, 1978.

Joseph A. Rosenthal, and Irving Morris, of Morris & Rosenthal, Wilmington, Del., and Louis L. Redding, Wilmington, Del., for individual plaintiffs.

Richard Allen Paul, of Paul, Lukoff & Hurley, Wilmington, Del. (Louis R. Lucas, Ratner, Sugarmon, Lucas, Salky & Henderson, Memphis, Tenn., of counsel), Paul R.

Dimond, of O'Brien, Moran & Dimond, Ann Arbor, Mich., William L. Taylor, Center for National Policy Review, Washington, D. C., for intervening plaintiffs.

Aida . Waserstein, Wilmington, Del., for intervening Hispanic plaintiffs.

Richard R. Wier, Jr., Atty. Gen., State of Del., and Regina M. Small, Deputy Atty. Gen., State of Del., William Prickett, and Mason E. Turner, of Prickett, Ward, Burt & Sanders, Wilmington, Del., Philip B. Kurland, Chicago, Ill., for defendant State Board of Education.

Edward W. Cooch, Jr., of Cooch & Taylor, Wilmington, Del., for Marshallton-McKean School District.

Samuel R. Russell, of Biggs & Battaglia, Wilmington, Del., for Alexis I. duPont School District.

William Poole, of Potter, Anderson & Corroon, Wilmington, Del., for Alfred I. duPont School District.

James T. McKinstry, of Richards, Layton & Finger, Wilmington, Del., for Claymont and Stanton School Districts.

John P. Sinclair, of Potter, Anderson & Corroon, Wilmington, Del., for Newark School District.

Jerome O. Herlihy, of Herlihy & Herlihy, Wilmington, Del., for Conrad Area School District.

Howard M. Handelman, and Jeffrey M. Weiner, of Bayard, Brill & Handelman, Wilmington, Del., for New Castle County Vocational-Technical School District.

James M. Tunnell, Jr., and Richard D. Allen, of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for Mount Pleasant School District.

David F. Anderson, of Potter, Anderson & Corroon, Wilmington, Del., for New Castle-Gunning Bedford School District.

Thomas S. Lodge, of Connolly, Bove & Lodge, Wilmington, Del., for DeLaWarr School District.

Henry N. Herndon, Jr., and Edward M. McNally, of Morris, James, Hitchens & Williams, Wilmington, Del., for New Castle County Planning Board of Education, a non-aligned party.

Leonard L. Williams, and George E. Evans, Wilmington, Del., for Wendell Howell, member of New Castle County Planning Board of Education.

Sheldon N. Sandler, of Bader, Dorsey & Kreshtool, Wilmington, Del., amicus curiae, Delaware State Education Association.

Clifford B. Hearn, Jr., of Balick & Hearn, P. A., Wilmington, Del., amicus curiae, Wilmington Federation of Teachers AFT AFL–CIO.

## OPINION

MURRAY M. SCHWARTZ, District Judge.

This opinion treats the latest in a series of stay motions filed by defendant Delaware State Board of Education ("State Board").[1] The instant stay motion seeks a stay of the denial of a permanent injunction which had been requested to preclude the New Castle County Planning Board of Education ("NCCPBE") from "fixing, levying or collecting a local tax for current operating expenses in excess of the limit established by applicable State law."[2] Specifi-

cation to levy and collect a local property tax for current operating expenditures in excess of $1.585 per hundred dollars of assessed valuation, the tax rate established by the State Board of Education pursuant to Senate Bill 457. Specifically, the State Board of Education moves that the authority of the Planning Board to levy and collect taxes for current operating expenses be limited to $1.585 per hundred until either further order of this Court or order of the United States Court of Appeals for the Third Circuit in connection with the appeal taken by the Delaware State Board of Educa-

---

1. *Evans v. Buchanan*, 455 F.Supp. 705 (D.Del. 1978) (denied stay pending appeal of January 9, 1978 secondary remedial decree); 435 F.Supp. 832, 841–49 (D.Del.1977) (granted partial stay of primary remedial decree pending disposition of certiorari petition); 424 F.Supp. 875 (D.Del. 1976) (denied as premature stay of three-judge court primary remedial decree).

2. Doc. 757. The stay motion at issue would have "this Court enter a partial stay of implementation of its order of May 5, 1978 and that much of its order of January 9, 1978 as permits the New Castle County Planning Board of Edu-

cally, the State Board authorized a maximum rate of $1.585, 9.5 cents less than the $1.68 rate previously adopted by the NCCPBE. Because the background leading to denial of the preliminary injunction has been detailed elsewhere,[3] it will not be repeated in full. There follows only an account essential to understanding the issues.[4]

As early as May 1976, a predecessor three-judge court made clear that because reorganization was necessary to achieve a unitary school system within the desegregation area by September 1977, a single school district would replace the existing eleven component school districts unless a different governance structure for a unitary school district were timely developed by state authorities.

With time running out and State authorities still having refused to act responsibly, the Third Circuit Court of Appeals on May 18, 1977 provided Delaware authorities an additional sixty days in which to act.[5] State authorities again declined to timely respond in an acceptable manner. Thereafter, on August 5, 1977, pending disposition by the Supreme Court of an application for certiorari, this Court stayed implementation of existing orders insofar as the same required an operating unitary school system by September 1977. At the same time, the Court directed that planning for implementation of a unitary school system with single district governance should proceed on the assumption there would be single district governance commencing July 1, 1978.

On October 3, 1977, the Supreme Court denied the petition for certiorari.[6] On December 16, 1977, the Delaware Legislature expressly refused to act even though specially convened for the purpose of addressing desegregation.[7] Consequently, after extensive hearings held during October, November and December of 1977, and faced with inaction on the part of State authorities, the Court addressed governance questions in its secondary remedial decree issued January 9, 1978.

To provide authorization and guidance for the NCCPBE, that decree fleshed out the details of governing the single district, a task necessitated by the legislative failure to enact a statutory governance framework. Specifically, the January 9 decree provided for local taxing authority and delineated a procedure for establishing a maximum tax rate for local current operating expenses. That the tax problem was of particular concern to the Court was reflected in these passages:

"Authorization to set a school tax rate is properly a product of the political process. For that reason, it is my view a federal court should not become involved failing a total abdication of responsibility over a period of time such that further delay significantly jeopardizes constitutional rights. . . .

"It is with deep seated reluctance overcome only by the pressing, immediate necessity and the realization that no other option is available to fill the legislative void that the Court becomes involved at all in matters of taxation. Were it not true that the desegregation process faces

tion from this Court's order of May 5, 1978." Doc. 817.

Although the motion references the tax aspect of the January 9, 1978 order, that order and its accompanying opinion preceded any legislative action. Because the January 9, 1978 opinion invited legislative action in the tax realm which ultimately occurred and led to defendant State Board's request for permanent injunctive relief which was denied on May 5, 1978, the May 5, 1978 order denying injunctive relief will be treated as the operative order sought to be stayed.

3. *Evans v. Buchanan*, 455 F.Supp. 692 (D.Del. 1978).

4. In many instances the factual account will not be annotated to the record because of inability to refer to the same since it is lodged with the Third Circuit Court of Appeals.

5. *Evans v. Buchanan*, 555 F.2d 373, 380–81 (3d Cir. 1977).

6. 434 U.S. 880, 98 S.Ct. 235, 54 L.Ed.2d 160 (1977).

7. For further explication, see *Evans v. Buchanan*, 447 F.Supp. 982, 1017 n. 151 (D.Del.1978).

imminent peril unaddressed by any other practical alternative, the federal court would not intrude. If the political process had provided statutory machinery or a procedure for devising a tax rate for the single district, or if there were not an immediate need to act now, I would further defer the matter of local tax rate authorization.

"The Court is compelled, however, to order that a tax rate be established. This action is taken with the understanding that the Legislature can alter the parameters authorized. Because state political processes are preferred over even limited intervention by a federal court, the Delaware Legislature may raise or lower the tax authorization established here. The Court must caution, however, that any legislative action that lowers the established tax rate below a generally acceptable rate to a point at which the desegregation process would be imperiled will be received skeptically. Given the historical stance of the Legislature, if such a lowering occurs, the usual presumption of legislative regularity will not attach. If, as an alternative, the Delaware Legislature makes provision for replacement of the authorized revenue lost through reduced local school tax rates, the local school tax rate can be lowered to any level or even eliminated." [8]

The Court, following State law as closely as was feasible, established a top limit of $1.91 for the local current operating expense component of the local school tax rate.[9] In addition, it required the NCCPBE to establish the local school tax rate by February 24, 1978 so that all real property owners in the desegregation area would have an opportunity to do the necessary planning to meet their tax obligations.[10] Finally, it cautioned the upper limit would be binding in future years absent a successful referendum or legislative relief.[11]

From the foregoing it is evident the Court responded to fiscal matters because: (1) of the absolute necessity to adequately provide the desegregation effort with financial support; and (2) time was of the essence in assuring that the public had prompt notice of its tax obligations. Nonetheless, once again deferring to the legislative will, the Court invited the Delaware Legislature to assume its responsibility to establish a tax mechanism for the single district, cautioning only that "any legislative action that lowers the established tax rate below a generally acceptable rate to a point at which the desegregation process would be imperiled will be received skeptically." [12]

Fully one month after the January 9 order, the Legislature acted. Rather than provide for a single tax rate, however, the Legislature took an entirely different tack. Specifically, on February 9, the General Assembly passed Senate Bill ("S.B.") 456 which "directed the State Board of Education to devise an alternative plan of governance to the judicial single district" to "be submitted by the State Board to a joint executive/legislative commission." [13] A four-district reorganization plan was submitted and approved by the commission on February 15, 1978. At the same time, tax rates were established for each of the four districts pursuant to authority vested in the State Board by S.B. 457, companion legislation to S.B. 456.[14]

Although S.B. 457 also provided a mechanism for establishing a maximum tax rate for a single district, implementation of it

---

8. *Evans v. Buchanan*, 447 F.Supp. 982, 1025–26 (D.Del.1978) (footnote omitted).

9. *Id.* at 1033. Unless otherwise indicated, all dollar amounts refer to the current expense component of the local school tax.

10. *Id.* at 1035.

11. *Id.* at 1033.

12. *Id.* at 1026.

13. Doc. 750 (Defendant State Board's Brief in Support of the legislative reorganization plan).

14. The rates for current operating expenses for the four districts ranged from $1.343 to $1.784.

was postponed and no rate was set.[15] Instead, the State defendants geared their efforts toward promoting the four-district plan. That this plan was in conflict with the January 9 order was apparent at the outset and reluctantly conceded by representatives of the State defendants. Nonetheless, the State Board took the position that absent an injunction, it would proceed to implement a four-district plan. Further, it urged the Court to ratify the legislative will represented by S.B. 456 by performing the jurisdictional impossibility [16] of modifying its order of January 9. On March 16, 1978, after valuable time required for implementation of the desegregation order had been diverted to consideration of the four-district plan, a preliminary injunction issued enjoining implementation of the four-district plan.

At a conference shortly thereafter, the Court sua sponte raised the question of whether the State Board intended to act pursuant to S.B. 457 in setting a tax rate for the single district. Answering affirmatively, the State Board indicated that the amount calculated by the State Board under the legislation would be $1.527 as later set out in the affidavit of James L. Spartz, Director of Finance. Counsel for the State Board also indicated that the single tax rate had not been set because of a concern that the State Board might be found in contempt. No explanation was proffered of why a single tax rate had not been set prior to the enjoining of the four-district plan. Following the conference, the State Board moved to permanently enjoin the NCCPBE from fixing a rate in excess of that authorized by the State Board, presumably $1.527.

Hearings were held over the three-day period, April 11 to April 13, on the State Board's motion for permanent injunction. The purpose of the hearings was to determine whether implementation of a tax rate of $1.527 was compatible with the Court's January orders or likely would frustrate desegregation. At the close of hearings but prior to ruling on the State Board's motion, the Court directed the State authorities to formally fix a tax rate pursuant to S.B. 457. At that point the State Board formally adopted a tax rate not of $1.527, but rather of $1.585.

The State Board has explained the discrepancy between its initial proposed rate and the rate it actually set as follows: "During the hearings additional information came to light justifying somewhat different calculations and resulting in a somewhat different tax rate." [17] It is not clear which additional information the State Board references by this statement, but the earlier tax opinion in this case noted "the amount of $1.527 in addition to containing a significant mathematical error was calculated in a manner which departed dramatically from the legislation" from which it derived with "the effect of yielding a lower tax rate than would obtain by any reasonable reading of the statute." [18]

Thus, although the State Board stood in the shoes of the Legislature urging that the tax rate like the four-district plan was a legislative expression entitled to deference, the rate of $1.527 proposed by the State Board was not even a rough translation of S.B. 457. After the $1.585 rate was authorized by the State Board, it was again argued that such rate was inviolate, conceived as it was pursuant to legislative authority.

**15.** Indeed, upon inquiry in open court sometime in March as to what the proposed rate would be in a single district, counsel for defendant State Board informed the Court he could not provide an authoritative answer. If defendant State Board had established the single district rate simultaneously with the setting of the rates for the proposed four districts, the NCCPBE would have benefited by knowing that rate prior to February 23, 1978, when it set the $1.68 rate.

**16.** *Evans v. Buchanan*, 447 F.Supp. 1041, 1051–52 (D.Del.1978).

**17.** Doc. 786 at 3.

**18.** *Evans v. Buchanan*, 455 F.Supp. 692, at 699 n. 14 (D.Del.1978). For example, the $1.527 rate was predicated on current per pupil expenditures instead of current total operating expenses as required by statute. Further, an erroneous historic percentage of increase figure was utilized.

The submission of various figures, each purporting to be the definitive number but each tainted by mathematical error suggests that each of the different rates set was not a well considered legislative judgment. Furthermore, the $1.585 rate was based entirely on a proposed enrollment figure for September 1978 which was lower than all other reasoned projections.[19] That the State Board's figure was higher than one of the working hypotheses of the NCCPBE does nothing to mitigate the entirely speculative character of it.

Nonetheless, putting aside concerns going to the inherently speculative character of future enrollments and those reservations about the changing tax rates, the Court confined its inquiry to whether imposition of a tax rate as low as $1.585 was likely to imperil desegregation.[20] It seemed relatively unimportant how and why the State authorities arrived at the substitute figure of $1.585 or whether it was mathematically imprecise as long as it was sufficient to accomplish the job at hand and it was to this question that the Court turned its attention. Unhappily, it was concluded the amount generated by the rate was insufficient to insure a stable desegregation plan effective for the coming and future years. Upon representations that the State would not agree to paying the difference if indeed the $1.585 proved inadequate as feared, the Court issued an opinion and order on May 5 denying the State Board's motion for a permanent injunction.

Although an appeal was promptly lodged, a stay of the order was not sought until June 5, 1978 after the Court had inquired about the same at a chambers conference held on May 23, 1978. Nonetheless the State Board now urges a speedy disposition because "New Castle County tax officials must know the rate of tax which is to be levied and collected by June 15, 1978, [and] that mailing of the tax bills must begin no later than June 30, 1978."[21]

■ Defendant State Board's motion for a stay was brought pursuant to F.R. Civ.P. 62. Because defendant seeks to stay the denial of an injunction, the effect of which is to grant an injunction, the motion fits squarely within Rule 62(c) authorizing the Court to issue an injunction pending appeal.[22] A party seeking a stay under Rule 62(c) must show that (1) the party "will likely prevail on the merits of the appeal, (2) that he will suffer irreparable injury if the stay is denied, (3) that other parties will not be substantially harmed by the stay, and (4) that the public interest will be served by granting the stay." *Long v. Robinson*, 432 F.2d 977, 979 (4th Cir. 1970). *Accord, Reserve Mining Co. v. United States*, 498 F.2d 1073, 1076–77 (8th Cir.), *application to vacate stay denied*, 419 U.S. 802, 95 S.Ct. 287, 42 L.Ed.2d 33 (1974).[23]

19. Utilizing the identical statistical technique employed by the State Board, a researcher at the University of Delaware arrived at a higher figure. Other methods generated various projections. *Evans v. Buchanan*, 455 F.Supp. 692 at 704 (D.Del.1978).

20. Fortunately, at the April hearings the NCCPBE submitted substantial evidence of what is required to operate the single district so that the inquiry could intelligently proceed. Thus, it was unnecessary to reconvene the parties for a second round of tax hearings based on the State's substitute tax rate. No party sought the opportunity for additional hearings.

21. Doc. 817 at 2–3.

22. Rule 62(c) provides:
    "(c) Injunction Pending Appeal. When an appeal is taken from an interlocutory or final judgment granting, dissolving, or denying an injunction, the court in its discretion may suspend, modify, restore, or grant an injunction during the pendency of the appeal upon such terms as to bond or otherwise as it considers proper for the security of the rights of the adverse party. If the judgment appealed from is rendered by a district court of three judges specially constituted pursuant to a statute of the United States, no such order shall be made except (1) by such court sitting in open court or (2) by the assent of all the judges of such court evidenced by their signatures to the order."

23. Because the criteria for a stay and an injunction traditionally have been considered interchangeably, these factors echo those required by the Third Circuit for a preliminary injunction, *A. O. Smith Corp. v. F. T. C.*, 530 F.2d 515, 525 (3d Cir. 1976).

In an earlier phase in this litigation, this Court considered that the first criteria going to the movant's showing on the merits required additional explication in the context of a stay motion because by that stage the Court has already made a judgment on the merits and is unlikely to reverse itself.[24] To give substance to the standard, the Court determined that in the context of a petition for a stay, the relevant inquiry on the merits is whether "the appeal raises serious and difficult questions of law in an area where the law is somewhat unclear."[25] Application of this standard is appropriate in the context of the matter *sub judice.*

Here, the movant already unsuccessfully has sought an injunction. In the May 5 opinion and order, the Court concluded that the State Board failed to make the showing required to justify a permanent injunction of any tax rate in excess of the $1.585 figure. The issue presently before the Court is whether defendant State Board can make a sufficient showing to warrant an injunction resulting in the $1.585 figure governing during the pendency of an appeal from the May 5 order.

### 1. Showing on the Merits

Defendant State Board avers this case contains two serious and difficult questions of law on which it ultimately could prevail on the merits: (1) whether factually S.B. 457 as applied by the State Board does imperil desegregation; and (2) whether *San Antonio Independent School District v. Rod-* *riguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), and related principles of federalism control this case. As an issue of law, the first question presumably will be adjudged by a reviewing court under the standard whether this Court's factual findings were clearly erroneous. *E. g., Merrell-National Laboratories, Inc. v. Zenith Laboratories, Inc.,* 579 F.2d 786 (3d Cir. 1978); *Ostapowicz v. Johnson,* 541 F.2d 394, 400 (3d Cir. 1976), *cert. denied,* 429 U.S. 1041, 97 S.Ct. 741, 50 L.Ed.2d 753 (1977); *see Dayton Board of Education v. Brinkman,* 433 U.S. 406, 417–19, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977). If the Court's factual findings are held not to be clearly erroneous, the issue presented by the second question is whether principles of federalism compel acceptance of a legislatively endorsed maximum tax rate even when such a rate would frustrate a paramount constitutional right vindicated by a remedial desegregation decree.

### A. State Board's Factual Argument

With respect to the first argument, the Court did not consider the facial validity of S.B. 457[26] but limited its inquiry to whether the actual rate set pursuant to it would imperil or frustrate the desegregation process during the transition years. The May 5 opinion constitutes this Court's findings of fact and reasoned conclusion that the desegregation process would be struck a mortal blow if defendant State Board's implementation of S.B. 457 were to control.[27]

---

**24.** *Evans v. Buchanan,* 435 F.Supp. 832, 843–47 (D.Del.1977).

**25.** *Id.* at 844. *See Sonesta International Hotels Corp. v. Wellington Associates,* 483 F.2d 247, 250 (2d Cir. 1973).

**26.** The constitutionality of S.B. 457 was not reached, despite a fourteenth amendment challenge to it by the NCCPBE. Consequently, in its May 5, 1978 opinion, the Court variously stated the issue as:

"The question before the Court is whether S.B. 457 as implemented by the State Board provides a taxation scheme likely to frustrate or imperil the desegregation process in the single school district. It is concluded that question must be answered affirmatively and consequently no injunction will issue." *Ev-*

*ans v. Buchanan,* 455 F.Supp. 692 at 694 (D.Del.1978).

"To understand the conclusion that the State Board's tax rate likely will frustrate the desegregation process, it is necessary to review the context from which the State legislation emanated." *Id.* at 695.

"In the face of the two disparate tax rates, the issue now posed for decision is whether the formula for local school funding set out by the Legislature as interpreted by the State Board is an acceptable 'practical alternative' or threatens to imperil the desegregation process in the coming or future years and must be rejected." *Id.* at 696 (footnote omitted).

**27.** The text of the May 5, 1978 opinion makes clear that S.B. 457 as implemented by defendant State Board would frustrate the primary

Viewing the practicalities of the situation and the record as a whole, the Court acting under its equitable power concluded that implementation of a $1.585 rate would imperil the desegregation effort during the upcoming years of transition. This decision simply raises on appeal whether, in so finding, the Court abused its discretion, *Wright v. Council of City of Emporia,* 407 U.S. 451, 471, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972). Defendant State Board has not brought to this Court's attention any factual inadequacy on which the Court based its holding.[28]

Accordingly, it is concluded defendant State Board's factual argument does not pose a serious and difficult question of law.

### B. *State Board's Federalism Argument*

Defendant State Board's second argument that denial of the requested permanent injunction constitutes an infringement of the legislative process is predicated in large part on *San Antonio Independent School District v. Rodriguez, supra.* The argument is not new, having been made during the hearings preceding the May 5 order and rejected in the tax opinion of that date.

*Rodriguez* involved a challenge to an existing statutory scheme of school financing[29] which, based in part on local property taxes, resulted in various degrees of affluence among several school districts. The claim of the plaintiff that this financial disparity among school districts impermissibly infringed on his right to an education equal to that provided in other districts was deemed unconvincing. Finding that wealth is not a suspect class and that there is no fundamental right to an education under the Constitution, the Supreme Court re-

---

and secondary remedial decrees carefully tailored to redress the constitutional violations endured by plaintiffs. Reference to that opinion demonstrates the Court was doing nothing other than exercising its equitable powers to preserve remedial decrees which have as their objective achieving a racially nondiscriminatory unitary school system:

"[I]f the record compels the conclusion that the State Board's rate jeopardizes the chances for success of the remedial scheme for redress of a constitutional violation, the requested permanent injunction against a higher maximum rate should be denied." *Evans v. Buchanan,* 455 F.Supp. 692 at 699 (D.Del.1978).

"It is obviously difficult to quantify human experience or to describe with accuracy that financial point below which desegregation would be imperiled. One can, however, say with some assurance that when less is spent on education during the first year of desegregation than would have been spent absent desegregation, the effort to desegregate is threatened if not imperiled." *Id.* at 700–701 (footnote omitted).

"To embark on the long overdue course of desegregation with funds which, if minimally sufficient to satisfy operating costs for one year, are inadequate to meet the actual costs *of desegregation and reorganization is to invite disaster." Id.* at 701–702.

"An analysis of the financial needs of the new district reveals that even if the tax rate [authorization] set by the State Board generated minimally sufficient income in the first year, it would be hopelessly deficient for the second year. It therefore follows that if the

NCCPBE set a rate now which would hold the required amount of future desegregation costs in reserve, certain failure would be assured in the coming year." *Id.* at 702.

**28.** The record was developed over three days of hearings; less than one-half day taken by the State Board to complete its case and over two and one-half days in which the NCCPBE undertook the primary role of demonstrating minimal funding requirements for the new district.

**29.** In the instant matter State defendants do not rely upon a preexisting statutory scheme. Indeed the State Legislature has chosen to treat the new single district differently from all other school districts in the State of Delaware. Until the time of passage of S.B. 457, which was directed exclusively to the desegregation area, the maximum tax rate authorization in a reorganized district was fixed by statute as the highest of any of the local current operating *tax rates of the component districts.* In its January 9, 1978 opinion and order the Court followed the existing statutory scheme, modifying it only to eliminate aberrations. With the passage of S.B. 457, the Legislature departed not only from the method of computation of the maximum tax rate authorization, but also isolated the district as the only one not permitted to establish the maximum tax rate authorization pursuant to preexisting Delaware law. Instead, unlike its treatment of other school districts in the State of Delaware, the Legislature conferred the power to fix the tax cap upon defendant State Board of Education.

versed the lower court's contrary conclusions.

The State Board's heavy reliance on *Rodriguez* would suggest that because the two cases somehow have to do with the education of school children, one controls the other. The comparison is inapt. Were the eleven districts in operation with their vastly different tax bases and tax rates and a plaintiff, for example, from the less affluent New Castle-Gunning Bedford or DeLa-Warr district sued to obtain the level of financing expended on children in the Wilmington or Alexis I. districts, *Rodriguez* would apply. In the instant case, however, little is gained by reference to it. The parties are not litigating financial inequities but rather the final steps in the remedial phase of a desegregation order and it follows therefore that the Court's equitable power is the mainspring. *Brown v. Board of Education*, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) (*"Brown II"*).[30]

Notwithstanding the remedial context of this desegregation case, the State Board contends that in matters of local taxation the expressed will of a state legislature is decisive.[31] But if a state's taxing power is plenary under all circumstances, a demonstrably hostile state legislature could easily thwart a desegregation process. Although it is obviously appropriate for the Delaware Legislature to provide leadership, particularly in such extraordinary circumstances, and the Court repeatedly has implored the Legislature to do so, it does not follow that legislation ultimately passed is ipso facto binding upon the Court.

When a federal court finds it necessary to override State authorities in a matter of local taxation, albeit with respect to application of a statute rather than to its facial validity, a tension is created between fundamental precepts. That tension is between principles of federalism impelling a federal court to defer to State legislative enactments and the judicial duty to enforce equitable decrees vindicating the constitutional right to attend a racially nondiscriminatory unitary school system. In denying the State Board's request for permanent injunction on May 5, 1978, that tension was resolved in favor of the equitable power of a federal court to enforce its remedial decrees however unpopular or economically unattractive.

In a motion for stay pending appeal, the focus is not upon resolution of the tension by the district court, but whether it presents a serious question of law in an area where the law is unsettled. Although the May 5 opinion reflects the conclusion of this Court that the tension cannot be resolved in favor of the State Board because imposition of a $1.585 rate actually imperils desegregation and thus would frustrate vindication of constitutional rights, the presence of the tension cannot be denied. It remains for appellate tribunals to definitively resolve whether, if the facts as found by this Court are not clearly erroneous, the tension should be resolved otherwise. Ar-

---

. **30.** When acting in equity, a court must exercise a "practical flexibility in shaping its remedies and . . . a facility for adjusting and reconciling public and private needs," *Brown v. Bd. of Educ.*, 349 U.S. 294, 300, 75 S.Ct. 753, 756, 99 L.Ed. 1083 (footnotes omitted), and must "necessarily take into account the practicalities of the situation." *Evans v. Buchanan*, 555 F.2d at 379 (3d Cir. 1977) (quoting *Davis v. Board of School Comm.*, 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1971)).

**31.** To the extent there is implicit in the State Board's contention that overturning a legislative expression requires a finding of discriminatory intent or bias in passage, this argument fails in the context of a remedial desegregation decree under *Milliken v. Bradley*, 433 U.S. 267,

97 S.Ct. 2749, 53 L.Ed.2d 745 (1977) (*"Milliken II"*). The State Board's position in this regard is essentially the same advanced by it in relation to ancillary relief and rejected by this court in the secondary remedial decree. 447 F.Supp. at 1014–15. In short, *Milliken II* makes clear that remedial orders must be grounded on findings that they are "necessary and essential" to "remedy" a constitutional violation. *See* 433 U.S. at 279–88, 97 S.Ct. 2749. The finding of the Court in its May 5 opinion that the $1.585 rate imperils desegregation reflects the implicit conclusion that a rate higher than $1.585 is both necessary and essential for the achievement of a unitary racially nondiscriminatory public school system in northern New Castle County.

guably, the inquiry poses a not insubstantial question of law.[32]

In addition to presenting a substantial legal question, the State Board as movant must also demonstrate under Rule 62 that the record supports invocation of an extraordinary equitable remedy. *Mayflower Industries v. Thor Corp.*, 182 F.2d 800 (3d Cir. 1950). To prove that the balance of equities weighs in its favor, the movant must demonstrate irreparable harm justifying issuance of an injunction and convince the court that issuance of a stay will not adversely affect either the public or the party already prevailing on the merits.

### 2. *Irreparable Harm*

Throughout the proceedings, the State Board has represented the political and educational interests of the State.[33] Delegated by the Legislature to calculate a tax rate, the State Board has argued vigorously in defense of the rate and of the legislative authorization, urging that "in the field of taxation . . ., special deference is normally paid to legislative judgments."[34] In its representation of the legislative branch, the State Board argued the "Delaware Legislature has attempted to balance competing interests—the interest of taxpayers in having an educationally sound system which they can afford on the one hand and the interests of labor organizations in securing benefits for their employees on the other."[35]

In setting forth the alleged irreparable harm which it will suffer absent an injunction, defendant State Board cannot point to any damage to its educational interest. It therefore claims exclusively to represent the interests of New Castle County taxpayers[36] and avers that the interests of the State Board and the public coincide.

Initially it is noted the State Board's representation of the taxpayers' interest is anomalous when one considers the disinterest in seeking an early adjudication of the tax matter so that taxpayers could be promptly informed of their responsibilities and proceed intelligently. On behalf of the taxpayer, the State Board at oral argument expressed its concern that if $1.585 is not deemed the controlling tax rate, the NCCPBE will incur excess financial obligations with resultant yet undescribed injury to the taxpayers. Ignoring the State's statutory scheme for refunding overpayments[37] should reversal of the May 5 order occur, the State Board then refers to the "administrative nightmare" of effectuating refunds and posits that a supplemental tax assessment upon affirmance of the May 5 order presents a far less disruptive and expensive procedure.[38] One must conclude on this showing that irreparable harm will not beset either the State Board or the taxpayer. At best the taxpayer will be entitled to a rebate if there is a reversal of the May 5 order. The delay and cost attendant to its execution cannot in the circumstances of this case be considered irreparable harm.

---

**32.** In a concededly far more difficult context, *i. e.,* where a federal court actually established the tax rate for consolidated districts undergoing desegregation, two Justices would have granted certiorari to consider the issue. "The CHIEF JUSTICE and MR. JUSTICE POWELL would grant certiorari in No. 75-214 [*Berkeley Sch. Dist. v. United States*] limited to question whether a Federal Court has authority to fix and impose the school tax rate upon the residents of the consolidated school district without allowing the rate to be determined in accordance with Missouri law." *Kinloch Sch. Dist. v. United States*, 423 U.S. 951, 96 S.Ct. 374, 46 L.Ed.2d 288 (1975), *denying cert. to United States v. Missouri*, 515 F.2d 1365 (8th Cir. 1975).

**33.** The legislative and executive branches of State government have also been apprised of developments in this case on a routine basis.

**34.** Doc. 786 at 8.

**35.** *Id.* 9.

**36.** Doc. 819 at 12.

**37.** 14 *Del.C.* § 1921. *See also* 9 *Del.C.* § 8618.

**38.** There is no statutory provision for supplemental tax bills. *See* 9 *Del.C.* § 8607. The administrative costs of effecting refunds are estimated at $60,000–$100,000 whereas the costs of issuing supplemental bills are calculated at $25,000–$35,000. *Compare* Doc. 809 *with* Doc. 829.

### 3. *Harm to the Adverse Party*

Pursuant to the January 9 order permitting a tax cap of up to $1.91 and aware that monies must be held in reserve for future years to meet increasing responsibilities, the NCCPBE on February 24 set a tax rate of $1.68 and began to budget accordingly. The adverse party most directly affected by defendant's application is the NCCPBE which, charged with operating the schools, opposed and prevailed on defendant's motion for a permanent injunction.

A significant portion of the April hearings was consumed by the NCCPBE's effort to show that the State Board's calculations underlying its $1.527 rate were based on two wholly unrealistic principles, namely: (1) that despite reassignment, teachers and staff could be expected to continue working under their present salary schedules with the result that teachers and staff formerly from different districts would work side by side at substantially different pay scales; and (2) that some 600 teachers could be "riffed" as a result of declining enrollment.[39] The NCCPBE submitted that adoption of either of these premises would be administratively irresponsible and evidenced through expert testimony that a tax rate of $1.61 was necessary to operate the schools in a manner consistent with prior practice independent of the additional costs incurred as a result of reorganization and desegregation. In sum, the NCCPBE demonstrated that a tax rate greater than $1.61 was necessary to effectively desegregate now. In substantial agreement with the NCCPBE, the Court denied the State Board's motion for a permanent injunction which sought to establish the $1.585 rate into perpetuity.

The State Board now contends that no harm will befall the NCCPBE if the $1.585 rate is established during the pendency of the appeal because if the denial of the injunction is affirmed, additional monies can be obtained from the taxpayers by way of supplemental bills. Ignoring totally the difficulty in collecting on the supplemental bills and maintaining that the NCCPBE will have no interim cash flow problem, the State Board concludes no injury will have occurred. But this position has a Catch 22 quality. The argument is that if the NCCPBE doesn't have money in excess of that generated by the $1.585, the NCCPBE cannot spend or commit it. Having not committed the money, it can then be argued that the NCCPBE didn't need it.

In fact, the NCCPBE is already injured by the State Board's motion and will continue to suffer injury if the motion is granted. One would consider foolhardy indeed the businessman who would undertake a commercial venture without knowledge of his financial resources and obligations. Nonetheless, the State Board seriously maintains that this is a responsible manner by which to administer the educations of some 65,-000–70,000 children who will be experiencing desegregation for the first time. To effectively lead the desegregation effort, the NCCPBE must be positioned so that at a minimum it can contract responsibly. Undercutting the NCCPBE's power to obtain supplies and equipment[40] or to negotiate collective bargaining agreements with its staff[41] does nothing to aid the business at hand. The NCCPBE's ability to administer a racially nondiscriminatory unitary school system is clearly hampered by the State Board's efforts to impose a rate previously found unacceptable.

### 4. *Harm to the Public*

Both the NCCPBE and the State Board purport to represent the interests of the public. Throughout the course of proceedings the public interests have been defined

---

**39.** These premises are also operative under the State Board's higher rate of $1.585. *See* Doc. 786 (referring to State Board Tax Exh. 19).

**40.** At an earlier stage when state authorities refused to approve contracts for school buses, judicial intervention was required. Doc. 795.

**41.** Should a $1.585 rate be deemed operative, the NCCPBE anticipates that no collective bargaining agreement with the teachers would be effectuated by September and that its ability to negotiate with teachers at all would be jeopardized. Doc. 829.

in terms of certainty and stability. The Court in the January 9 opinion, D.C., 447 F.Supp. 982, identified the interests of minimizing taxes and establishing a tax rate, stating "the beleaguered taxpayer ought not to incur a tax increase beyond that absolutely essential for effective reorganization" [42] and "it is absolutely essential that the local school tax rate be established as quickly as possible" in order that taxpayers may "perform the necessary planning to meet their obligations." [43]

In reducing the tax rate, the Legislature acting through the State Board has arguably expressed some concern with the necessity to limit taxes. But the State Board can make no showing that it has promptly sought resolution of the tax issue so that school authorities could notify taxpayers of their obligations. On the other hand, the NCCPBE on February 23 promptly set a tax rate as ordered by the Court. The NCCPBE held in reserve funds for the future by not going to the limit of its authorization. Since that date, the NCCPBE has vigorously defended the propriety and necessity for that rate.

The effect on the public is best reviewed by considering the consequences of a stay. Denial of a stay followed by tax collection at a $1.68 rate would mean that upon reversal the taxpayers will be reimbursed. Grant of a stay would lead to tax bills based on the $1.585 rate, meaning that upon affirmance of the lower court order the taxpayers would receive a supplemental bill. The problems attendant to collecting supplemental bills are not inconsequential: (1) Separate school tax bills are likely to create collectibility problems in excess of those normally accompanying higher tax bills; [44] (2) Should the rate of collection fall below normal levels through either inadvertence or deliberate evasion, the NCCPBE likely would never receive the total funds which have been deemed necessary to the sound operation of the schools; (3) Upon receipt of a supplemental bill, the

taxpayer will likely be confused as to his obligations. Under these circumstances, it is concluded that injury to the public will be exacerbated by the grant of a stay.

In seeking a stay, the State Board made scant effort to redress the problems likely to ensue upon affirmance of the lower court order, saying only that supplemental bills could be issued. Addressing the difficulty of supplemental collection of those bills, the Court explained the possibility of granting the stay as requested by defendant State Board conditioned upon some assurance from the State that it would ultimately guarantee payment of monies which in the absence of a stay would be secured by the NCCPBE. A whole gamut of suggestions was posed, including: (1) posting a bond in the amount of the difference between the two tax rates, or some part thereof, reserving to the State the rights of the NCCPBE to collect the deficit monies from the taxpayers; and (2) posting a bond in the amount representing merely administrative costs. Despite its position that it is irreparably harmed in the absence of a stay, the State Board was unable or unwilling to support its application with agreement to facilitate, in any way, receipt of those uncollected funds.

## CONCLUSION

■ Although arguably presenting a not insubstantial question of law, defendant State Board has failed to demonstrate that a balance of the equities favors an injunction pending appeal. The applicant will suffer no irreparable injury independent of its asserted interest of the taxpaying public and the Court has concluded that injury to the public is likely increased by issuance of a stay. In addition, grant of a stay will clearly redound to the detriment of the NCCPBE which was created to effectuate the public interest by administering a unitary racially nondiscriminatory public school system. Grant of the requested injunction is, of course, an extraordinary rem-

---

42. *Evans v. Buchanan,* 447 F.Supp. 982, 1029 (D.Del.1978).

43. *Id.* at 1035.

44. Doc. 828.

edy. It becomes more so when one recognizes Delaware law contains explicit provisions for return of tax monies collected in error, but makes no provision for supplemental assessments as would be required if a preliminary injunction were granted and this Court's May 5 order thereafter affirmed on appeal. Rather than depart from existing State law and grant extraordinary relief under questionable circumstances, the Court will deny defendant State Board's application for stay.