Brenda **EVANS** et al., Plaintiffs,

v.

Madeline **BUCHANAN** et al.,
Defendants.

Civ. A. Nos. 1816–1822.

United States District Court,
D. Delaware.

Feb. 28, 1979.

Joseph A. Rosenthal, and Irving Morris, of Morris & Rosenthal, Louis L. Redding, Wilmington, Del., Louis R. Lucas, Ratner, Sugarmon, Lucas, Salky & Henderson, Memphis, Tenn., Paul R. Dimond, O'Brien, Moran & Dimond, Ann Arbor, Mich., William L. Taylor, Washington, D. C., Center for National Policy Review, for plaintiffs.

Aida Waserstein, Wilmington, Del., for intervening Hispanic plaintiffs.

Richard R. Wier, Jr., Atty. Gen., State of Delaware, and Regina M. Small, Asst. Atty. Gen., State of Delaware, William Prickett, and Mason E. Turner, Prickett, Ward, Burt & Sanders, Wilmington, Del., Philip B. Kurland, Chicago, Ill., for defendant State Bd. of Ed.

Henry N. Herndon, Jr., and Edward M. McNally, Morris, James, Hitchens & Williams, Wilmington, Del., for New Castle County School Dist.

Howard M. Handelman, Bayard, Brill & Handelman, P. A., Wilmington, Del., for New Castle County Vocational-Technical School Dist.

## OPINION

MURRAY M. SCHWARTZ, District Judge.

The question posed for resolution is whether a permanent injunction should issue enjoining the New Castle County Board of Education ("NCCBE") from fixing, levying or collecting the current operating expense component of the local school tax in excess of $1.585. Since this question has previously been answered in the negative[1] and will now be answered in the affirmative, some brief explanatory background of the germane procedural and factual history of this litigation is essential.[2] Because the

1. *Evans v. Buchanan*, 455 F.Supp. 692 (D.Del. 1978).

2. The complaint in this action was filed in federal court in 1956 after a Delaware State court action was reviewed by the Supreme Court as one of the consolidated actions in the landmark *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (*Brown I*). This litigation, which now has over 900 docket entries, has generated numerous opinions and orders since its reactivation in 1971: *Alexis I. duPont School District v. Evans*, (Rehnquist, J.) —— U.S. ——, 99 S.Ct. 32, 58 L.Ed.2d 83 (1978) (denial of reapplication for stay of execution of judgment and mandate of Third Circuit Court of Appeals affirmance of the secondary remedial decree; *Buchanan v. Evans*, (J. Brennan) —— U.S. ——, 99 S.Ct. 28, 58 L.Ed.2d 69 (1978) (denial of application for stay of execution of judgment and mandate of the Third Circuit Court of Appeals affirmance of the secondary

remedial decree; *Evans v. Buchanan*, 582 F.2d 750 (3d Cir. 1978) (affirmance of the secondary remedial decree and mandamus on grant of an injunction on establishing the school tax rate as determined by the Delaware Legislature and defendant, State Board; *Evans v. Buchanan*, 455 F.Supp. 715 (D.Del.1978) (denial of stay of ruling denying request for permanent injunction precluding the New Castle County Planning Board of Education from fixing, levying and collecting at a higher tax rate than that established by the State Legislature and defendant, State Board of Education); *Evans v. Buchanan*, 455 F.Supp. 705 (D.Del.1978) (denial of a stay of secondary remedial decree); *Evans v. Buchanan*, 455 F.Supp. 692 (D.Del.1978) (denial of State Board's motion for permanent injunction); *Evans v. Buchanan*, 447 F.Supp. 1041 (D.Del.1978) (preliminarily enjoining implementation of a four-district reorganization); *Evans v. Buchanan*, 447 F.Supp. 982 (D.Del.

tax rate history has been adequately detailed elsewhere,[3] however, only salient points essential to an understanding of this Opinion will be reviewed.

In January, 1978, the Court, confronted with a long and protracted default on the part of the State, issued a secondary remedial decree[4] consolidating eleven component school districts into a single district.[5] This consolidation was first announced on May 19, 1976 as a measure to be pursued only if the defendants continued to neglect their responsibility of effectuating a transition to a racially nondiscriminatory unitary school system.[6] That continuing default created a statutory void of mammoth proportions: there existed no authority or machinery for establishing, assessing and collecting local school taxes in the newly created single district. As a consequence, the January 9, 1978 secondary remedial decree necessarily included the fashioning of a ceiling on the tax rate assessable by the NCCBE. This Court's opinion of that date reflects an awareness of the gravity of that intrusion into sovereign prerogatives.[7] A top limit of $1.91 for the current operating expense component of the local school tax rate was established as the maximum that could be established by the NCCBE. The

Court fixed February 24, 1978 as the date by which the NCCBE should fix the local school tax rate. In establishing the current operating expense cap, it was stated:

> The Court is compelled, however, to order that a tax rate be established. This action is taken with the understanding that the Legislature can alter the parameters authorized. Because state political processes are preferred over even limited intervention by a federal court, the Delaware Legislature may raise or lower the tax authorization established here. *The Court must caution, however, that any legislative action that lowers the established tax rate below a generally acceptable rate to a point at which the desegregation process would be imperiled will be received skeptically. Given the historical stance of the Legislature, if such a lowering occurs, the usual presumption of legislative regularity will not attach.* If, as an alternative, the Delaware Legislature makes provision for replacement of the authorized revenue lost through reduced local school tax rates, the local school tax rate can be lowered to any level or even eliminated.

*Evans v. Buchanan,* 447 F.Supp. 982, 1026 (D.Del.1978) (footnote omitted and emphasis added).

1978) (secondary remedial decree); *Evans v. Buchanan,* 416 F.Supp. 328 (D.Del.1976) (three-judge court primary remedial decree), *aff'd with modification,* 555 F.2d 373 (3d Cir.) *cert. denied,* 434 U.S. 880, 98 S.Ct. 236, 54 L.Ed.2d 160 (1977); *Evans v. Buchanan,* 435 F.Supp. 832 (D.Del.1977) (granting a partial stay pending a determination of a petition for writ of certiorari and rejecting defendant State Board's reverse volunteerism plan); *Evans v. Buchanan,* 424 F.Supp. 875 (D.Del.1976) (rejecting application for a stay as premature); *Evans v. Buchanan,* 379 F.Supp. 1218 (D.Del.1974), and *Evans v. Buchanan,* 393 F.Supp. 428 (D.Del. 1975), *sum. aff'd, Buchanan v. Evans,* 423 U.S. 963, 96 S.Ct. 381, 46 L.Ed.2d 293 (1975).

**3.** *Evans v. Buchanan,* 582 F.2d 750, 774 (3d Cir. 1978); 455 F.Supp. 692 (D.Del.1978); *see* 455 F.Supp. 715 (D.Del.1978).

**4.** 447 F.Supp. 982, *aff'd,* 582 F.2d 750 (3d Cir. 1978).

**5.** The secondary remedial decree was appealed by all defendants between January 26, 1978 and January 30, 1978 and affirmed on July 24,

1978. *Evans v. Buchanan,* 582 F.2d 750 (3d Cir. 1978).

**6.** 416 F.Supp. 328, 351, 352–3, 357, *aff'd with modification,* 555 F.2d 373 (3d Cir.), *cert. denied,* 434 U.S. 880, 98 S.Ct. 235, 54 L.Ed.2d 160 (1977).

**7.** *Evans v. Buchanan,* 447 F.Supp. 982, 1026 (D.Del.1978) provides:

> It is with deep seated reluctance overcome only by the pressing, immediate necessity and the realization that no other option is available to fill the legislative void that the Court becomes involved at all in matters of taxation. Were it not true that the desegregation process faces imminent peril unaddressed by any other practical alternative, the federal court would not intrude. If the political process had provided statutory machinery or a procedure for devising a tax rate for the single district, or if there were not an immediate need to act now, I would further defer the matter of local tax rate authorization.

On February 9, 1978 the Delaware Legislature responded to the Court's invitation with the passage of Senate Bill 457 ("S.B. 457") codified at 14 *Del.C.* § 1924, which provided a formula to be used by the State Board of Education in establishing the top limit for the current operating expense component of the local school tax for the consolidated district. The State Board declined to follow promptly the legislative directive of S.B. 457[8] by establishing a maximum current operating expense rate for the single district. Not understanding that unexplained delay, the Court foresaw utter chaos, perhaps in the form of a state-court taxpayers' suit, that might lead to complete frustration of the desegregation process, particularly if the State Board waited until late May or June to establish a tax rate. Accordingly, the Court requested that the issue be placed before it in a procedural manner acceptable to the parties. On March 14, 1978, the defendant State Board filed a motion for a permanent injunction accompanied by an affidavit stating that the tax lid for current operating expenses would be $1.527.

A four-day hearing on the motion was held in April of 1978; the defendants took less than one half of the first day and the NCCBE utilized the remainder in an effort to demonstrate that a rate of $1.68 was essential for operation of the district during the 1978–79 school year. On April 17, 1978, the State Board of Education, after a directive from the Court, finally set a tax ceiling for current operating expenses: the limit it set was $1.585.

On May 5, 1978, an opinion and order issued denying the defendant's motion for a permanent injunction. The order was promptly appealed on May 22, 1978. Thereafter, on June 6, 1978, the State of Delaware, a nonparty, filed an original petition for Writ of Mandamus with the Third Circuit Court of Appeals seeking both the vacation of the May 5, 1978 order denying the permanent injunction and the entry of the injunction requested by the defendant. On July 24, 1978, the appellate court granted the writ of mandamus[9] directing me to: (1) vacate the May 5, 1978 order; (2) enter an order preliminarily enjoining a tax rate of $1.68 and requiring the NCCBE to impose a tax rate of $1.585; and (3) conduct a new hearing in accordance with the Court of Appeals' opinion. On July 26, 1978, the order directed by the Writ of Mandamus was entered. Thereafter, a hearing date of November 13, 1978 was established but, because of an intervening teachers' strike and resulting strains on NCCBE resources, was continued until December 6, 1978. Final briefing was completed on December 29, 1978. This opinion constitutes the Court's Findings of Fact and Conclusions of Law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

### I. The Constitutional Validity of Senate Bill 457 and the Current Operating Expense Tax Rate of $1.585

The Writ of Mandamus issued because the en banc court was convinced that this Court failed to accord the $1.585 tax rate established by the State Board of Education "a presumption of regularity and constitutionality" due a State legislative solution to a vexing taxation problem. The Court of Appeals concluded that "[a]bsent the proper presumption, the State Board's ability to make a strong showing on the merits—a requisite in any injunctive action—was improperly skewed." 582 F.2d 750, 779 (1978). Essentially, the Court of Appeals held defendant State Board satisfied its burden of proof warranting issuance of a permanent injunction by establishing the fact of passage of S.B. 457 and that defendant State Board had made tax calculations pursuant thereto. Thereafter the burden shifted to the NCCBE to demonstrate why the permanent injunction should not issue. Stated succinctly, the en banc court took the burden of proof of establishing the validity, as

---

**8.** Defendant State Board of Education on February 15, 1978 did set tax lids for current operating expenses for a four-district governance structure not in place.

**9.** *Evans v. Buchanan*, 582 F.2d 750, 774 (3d Cir. 1978).

applied, of S.B. 457 from the State Board and cast upon the NCCBE the burden of establishing its invalidity in the procedural context of defendant State Board's motion for permanent injunction.

Because the hearings held by this Court were viewed as having been conducted on an erroneous footing, the Court of Appeals did not review the ultimate finding of this Court that the $1.585 rate imperiled the desegregation process. Moreover, neither this Court nor the Court of Appeals ever ruled on the constitutional validity of S.B. 457. *See* 482 F.2d at 776 n.24; 455 F.Supp. 715, 721 n.26. As a consequence, although the NCCBE has continually pressed a Fourteenth Amendment challenge to S.B. 457, those arguments to this day have not been directly addressed. This Court relied instead on its broad power to protect its remedial decrees.[10] In its mandamus opinion, however, the Court of Appeals has emphasized that S.B. 457, a state legislative enactment, comes before this Court with a "presumption of regularity and constitutionality." Quoting from *Madden v. Kentucky*, 309 U.S. 83, 60 S.Ct. 406, 84 L.Ed. 590 (1940), the Court of Appeals stressed that:

> [I]n taxation, even more than in other fields, legislatures possess the greatest freedom in classification. Since the members of a legislature necessarily enjoy a familiarity with local conditions which this Court cannot have, the presumption of constitutionality can be overcome only by the most explicit demonstration that a classification is a hostile and aggressive discrimination against particular persons and classes.

*Id.* at 88, 60 S.Ct. at 408. Thus, at this juncture it is clear that this Court's remedial power is not broad enough, in the circumstances presently before the Court, to order or permit the circumvention of this state legislative enactment without a prior finding of its unconstitutionality.

Before reaching the question of the constitutionality of S.B. 457, some preliminary observations are in order. This Court emphasizes that it does not interpret the Court of Appeals' opinion as suggesting that in every instance in which a litigant contends that the actions of either a party or nonparty obstruct the operation of this Court's remedial orders, that litigant must undertake to prove that those actions are themselves unconstitutional.[11]

That the federal court retains power to prevent any person, whether or not a party, from obstructing the performance of duties or the exercise of rights conferred by remedial decrees—without requiring proof of fresh unconstitutional conduct—finds greatest support in *Wright v. Council of the City of Emporia*, 407 U.S. 451, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972). In a factual setting similar to the one before the Court, the Supreme Court upheld a district court's injunction that forbade a city from seceding from a county school system that was about to submit to court-ordered desegregation. In doing so the Court rejected Emporia's argument that since it was entitled to set up an independent school system under state law, "its action [could only] be enjoined only upon a finding either that the state law under which it acted is invalid, that the boundaries of the city are drawn so as to exclude Negroes, or that the disparity of the racial balance of the city and county schools of itself violates the Constitution." *Id.* at 459, 92 S.Ct. at 2202. The Supreme Court held that the District Court need not find an independent constitutional violation in order to countermand the proposed secession of Emporia from the county school system:

> The constitutional violation that formed the predicate for the District Court's action was the enforcement until 1969 of racial segregation in a public school system of which Emporia had always been a part. That finding has not been challenged, nor has Emporia ques-

---

10. *Evans v. Buchanan*, 455 F.Supp. 692, 698 (D.Del.1978) (denial of injunction to set tax rate).

11. Indeed, the Court of Appeals' opinion might reasonably be read as limiting itself only to legislation bearing on matters of taxation.

tioned the propriety of the 'pairing' order of June 25, 1969, which was designed to remedy the condition that offended the Constitution. Both before and after it became a city, Emporia educated its children in the county schools. Only when it became clear—15 years after our decision in *Brown v. Board of Education*—that segregation in the county system was finally to be abolished, did Emporia attempt to take its children out of the county system. *Under these circumstances, the power of the District Court to enjoin Emporia's withdrawal from that system need not rest upon an independent constitutional violation. The court's remedial power was invoked on the basis of a finding that the dual school system violated the Constitution, and since the city and the county constituted but one unit for the purpose of student assignments during the entire time that the dual system was maintained, they were properly treated as a single unit for the purpose of dismantling that system.*

*Id.* 407 U.S. at 459–60, 92 S.Ct. at 2202 (citations omitted and emphasis supplied). The crucial distinction between *Wright* and the facts now before this Court is that in the former, the city of Emporia undertook a course of action that in essence would have removed a great proportion of the school system from the Court's jurisdiction, thereby thwarting the operation of the desegregation order itself.

In *Brewer v. Hoxie School District No. 46*, 238 F.2d 91 (8th Cir. 1956), plaintiffs

were the local school board of directors whose attempt at voluntary desegregation [12] in accordance with *Brown I* was met with interference from a variety of private individuals and organizations. The Eighth Circuit held that the school officials, under *Brown I* and ultimately the Supremacy Clause, were entitled to an injunction restraining alleged acts of trespass and picketing. "The existence of a Constitutional duty presupposes a correlative Constitutional right in the person for whom the duty is to be exercised. . . . It is no less true, of course, that the existence of a Constitutional duty also presupposes a correlative right in the person upon whom the duty is imposed to be free from direct interference with its performance." *Id.* at 100 (citations omitted).

Here, unlike in *Brewer*, both local school authorities and private parties may look to specific orders of this Court for the duties and rights created by the Supremacy Clause. Thus the outstanding orders of the federal court, except to the extent they have been modified or questioned by this or an appellate tribunal, will serve as guideposts in the determination of whether a given course of action, whether taken by a party or nonparty and even if taken with benign intent, so obstructs the performance of duties under the decrees as to be prohibited without a finding of independent unconstitutionality.[13]

By contrast to *Brewer* and *Wright*, no litigant contends that S.B. 457 and the re-

---

**12.** The school authorities in *Brewer* did not await federal-court intervention; rather:

the school board of directors determined that as the Fourteenth Amendment to the United States Constitution, interpreted in *[Brown I]*, invalidated all state laws imposing segregated public education, the Board was required to desegregate the schools within their jurisdiction as soon as all administrative obstacles could be removed. The Board further determined that under Article VI, Clause 3 of the United States Constitution requiring state officers to bind themselves by oath to support the Constitution which by Article VI, Clause 2 is the supreme law of the land, they had the right and duty to change to a nondiscriminatory system without awaiting repeal of the Arkansas segregation statutes.

*Id.* at 93.

**13.** Only by way of the crudest example, a unilateral decision to remove any part of the consolidated district from the jurisdiction of the Court, or to permit broadly based exceptions to the pupil-assignment format—*even if taken for noninvidious reasons*—would interfere with obligations created by the decree. In those instances a person protected under the remedial orders of this Court would not bear the onus of establishing a new and distinct constitutional infirmity. *Wright v. Council of the City of Emporia, supra; see Akron Board of Education v. State Board of Education*, 490 F.2d 1285 (6th Cir. 1974). *See also Faubus v. United States*, 254 F.2d 797, 805–06 (8th Cir. 1958).

sulting $1.585 rate jeopardize the ability of any party to this litigation to perform duties imposed immediately by this Court and ultimately by the Supremacy Clause. This Court then interprets the Court of Appeals' mandate as establishing, that S.B. 457 cannot be overturned absent proof that it, in and of itself, is an unconstitutional exercise of legislative power. As will become apparent, however, the underlying Fourteenth Amendment violation established in *Brown I* is not entirely irrelevant.

The Court is met with the immediate and perplexing difficulty of deciding what standard should be applied to test the Bill's validity under the Fourteenth Amendment. Although the Court of Appeals' decision makes clear that the NCCBE bears the burden of proof on constitutionality, *see* 582 F.2d at 778, it does not address the question of what standard of review applies.

 Because of the underlying Fourteenth Amendment violation, *i. e.*, the history of *de jure* segregation in New Castle County schools established in 1954, there can be little argument that S.B. 457, a legislative response to court-ordered desegregation, implicates race. Accordingly, although I accept that the Court of Appeals properly instructs that the legislative enactment under review here comes cloaked with "[a] presumption of regularity and constitutionality," *id.*, and that as a consequence, the burden of making out a prima facie constitutional violation is cast upon the NCCBE, I do not accept the State Board's contention that the presumption dictates that the least rigorous standard of review, the rational-basis test, be applied. In its most notable recent application of the rational-basis test, the Supreme Court reaffirmed its prior holdings that the "rationality" standard does not apply to statutes that bear upon the delicate issue of race. *City of New Orleans v. Dukes*, 427 U.S. 297, 303,

96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1976) (per curiam).[14] Burden of proof should not be confused with standard of review. Here, where the State has acted in response to a specific remedial desegregation decree, the Fourteenth Amendment requires a most searching inquiry. *See Loving v. Virginia*, 388 U.S. 1, 9, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967). Since the defendants will ultimately prevail on even the strictest standard of review, however, because of the NCCBE's failure to establish that S.B. 457 constitutes a *prima facie* violation of the Fourteenth Amendment, they are not greatly penalized by the imposition of this standard and consequently, a thorough examination of this complex issue is not required.

Turning then to the elements essential to a finding of a fresh constitutional violation, it is recognized at the outset that this particular aspect of *Evans v. Buchanan* is not a garden-variety race-discrimination case. Were it so, the NCCBE would have the onus of showing the disparate racial impact of the state action (S.B. 457) and an unconstitutional intent to discriminate. *Washington v. Davis*, 426 U.S. 229, 239–42, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1977). The Court painstakingly reiterates that the post-decree context throws considerable confusion into the prima facie case of the New Board, in this instance for the simple reason that S.B. 457 does not create a classification with a disparate impact on the races, either on its face or in its operation. The statute does no more than establish a mechanism for the collection of revenues from all real property holders within the District. A demonstration of disparate impact on the races, usually the first step in proving a fresh Fourteenth Amendment violation, *see Village of Arlington Heights v. Metropolitan Housing Authority*, 429 U.S. 252, 266, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977),

---

14. The Supreme Court held:

Unless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage, our decisions presume the constitutionality of the statutory discriminations and require only that the classification challenged be rationally related to a legitimate state interest. States are accorded wide latitude in the regulation of their local economies under their police powers, and rational distinctions may be made with substantially less than mathematical exactitude.

*City of New Orleans v. Dukes, supra.*

could not be made here.[15] On reflection, however, it is obvious that proof of disparate impact only goes to the demonstration, in an otherwise neutral setting, that race is implicated at all.[16] *Id.* The New Board is relieved of the burden of so demonstrating: the implication of race in *Evans v. Buchanan* has been beyond serious question since 1954.[17] Hence, where the violation has been long since established and the remedial decrees have been issued only the question of unconstitutional intent to defeat those remedial decrees remains.

■ In reaching the question of intent, guidance is found in *Griffin v. Prince Edward County School Board*, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964), cited by the Court of Appeals. Prince Edward County, a Virginia county subject to a desegregation order, closed its public schools, while at the same time the State and the County offered tax concessions and tuition grants for parents to send children to local, newly established private academies that were closed to blacks. The Supreme Court held that, even though all school children in the county were treated alike, the actions taken would have the effect of denying public education to blacks, while offering a private, although publicly subsidized, equivalent to whites. *Id.* at 231, 84 S.Ct. at 1233.

A State, of course, has a wide discretion in deciding whether laws shall operate statewide or shall operate only in certain counties, the legislature 'having in mind the needs and desires of each.' . .

But the record in the present case could not be clearer that Prince Edward's public schools were closed and private schools operated in their place with state and county assistance, for one reason, and one reason only: to ensure, through measures taken by the county and the State, that white and colored children in Prince Edward County would not under any circumstances, go to the same school. *Whatever nonracial grounds might support a State's allowing a county to abandon public schools, the object must be a constitutional one, and grounds of race and opposition to desegregation do not qualify as constitutional.*

*Id.* (emphasis added; citations and footnote omitted). In *Griffin* the intent to thwart desegregation was inferred from the egregious character of the state action in light of the history behind the desegregation decree. It is evident, however, that, in the absence of such overwhelmingly destructive conduct, direct evidence of unconstitutional intent would be equally worthy. *Village of Arlington Heights, supra,* 429 U.S. at 266–68, 97 S.Ct. 555. Ultimately the inquiry is the same: did the defendant act in such a manner that the intent to impede court-ordered desegregation may be inferred? Specifically, did S.B. 457 and the State Board's calculation of the tax rate so strip the NCCBE of financial support that the unconstitutional intent to thwart desegregation decrees may be inferred as a matter of law;[18] or, (2) absent such stark financial

**15.** Under the *Arlington Heights* formulation, a litigant need not prove that challenged action resulted solely from a racially discriminatory purpose but rather that such purpose was a motivating factor in the decision. *Arlington Heights, supra,* 429 U.S. at 265, 97 S.Ct. 555.

**16.** Indeed, proof of the disparate impact of a facially neutral statute has not always been essential to demonstrating constitutional infirmity, particularly when the neutrality of the statute is offset by its propensity either to encourage private discrimination or to create an environment where racial inequities will prosper. *See Hunter v. Erickson,* 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969); *Reitman v. Mulkey,* 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967).

**17.** The Supreme Court declared unconstitutional the system of *de jure* segregation operative in New Castle County Schools in *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed.2d 873 (1954). Later when the Court summarily affirmed the three-judge court's finding of inter-district violation, *Buchanan v. Evans,* 423 U.S. 963, 96 S.Ct. 381, 46 L.Ed.2d 293 (1975), and denied certiorari on the primary remedial decree, *Buchanan v. Evans,* 434 U.S. 880, 98 S.Ct. 235 (1977), finality attached to a significant proportion of the remedy now in place.

**18.** *See Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886); *cf., Gomillion v. Lightfoot,* 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960).

evidence, does other evidence of unconstitutional intent, together with the uncomfortably low figure of $1.585 established by the State Board, indicate that the State defendants did not arrive at that figure in good faith?

The foregoing represents a summary of the controlling legal principles. The following are findings of fact pertinent to those principles, taking into account where relevant the guidelines articulated by the Court of appeals:

As emphasized above, this is not the "extreme case" in which the State funded "only $8 million for court-ordered programs, and no funds, or substantially insufficient funds, to operate the remainder of the school system, . . ." 582 F.2d at 780. Although no literal violation of this Court's remedial decrees would be presented by such a set of circumstances, such a flagrant departure from prior State practices, undertaken on the heels of a desegregation decree, would be freighted with indicia of unconstitutional intent. Essentially, the "extreme case" is simply another *Griffin* and it is not present on this record.

Moreover, the record reflects that at least for the time being, the "extreme case" that would certainly provide an impetus for relief of the sort decreed by this Court in May will not materialize. Although the record is not as clear as one would prefer on so crucial a point, it is assumed at least for the 1979–80 school year that the majority, if not all, of the cost of ancillary relief will be paid from federal funds.[19] Thus, a large portion of the direct costs of the desegregation decree will not pose a financial difficul-

ty to either the NCCBE or the State defendants. As counsel for the NCCBE observed, under one reading of the Court of Appeals mandate, this Court's inquiry into the finances of the consolidated school district would be concluded.[20] As suggested earlier, however, this Court views its scope of review as somewhat broader.

Compared to State funding in prior years, the revenues produced from the $1.585 represent a slight increase in absolute terms. Further while attributable primarily to imposition of a uniform tax rate, the $1.585 figure is higher than the former tax rates applicable in ten out of eleven component districts.[21] As plaintiffs emphasize, the local current operating expense revenues available to the NCCBE from the $1.585 figure this year, on a district-wide basis, represent a 13.06% increase over the local current operating tax expenditures in 1977–78.[22] Plaintiffs drive their point home by stressing that, on a per pupil basis, the percentage difference between the revenues available in 1978–79 and the expenditures in 1977–78 amounts to 23.48%.[23]

On the other hand, compared with the known and anticipated encumbrances of the New Castle County School Board, particularly after the recent teachers' strike, the revenues are hopelessly insufficient. Because the parties to this proceeding have devoted so much attention to the amount of the NCCBE's deficit, an effort to calculate its amount will be undertaken.

As an initial matter, the findings of fact set out by this Court in May, to the extent that they included prognostications, have proven to be accurate, with certain perti-

---

19. Doc. 902 at 97–98.

20. *Id.* at 132.

21. *Id.* at 114; 455 F.Supp. at 700. This Court's original rejection of that figure was grounded in the belief that the State must permit the consolidated school district taxation authority in an amount equal to the former districts' pattern of historical expenditures, in addition to the amount required to fund the direct costs of ancillary relief, 455 F.2d at 700, on the theory that if delivery of educational services fell precipitously, students would leave the district. That belief was translated into empirical fact

when 500 students left the New Castle County School system during the teachers' strike. Court Tax Exh. 6. In light of the Court of Appeals' mandate, resolution can only be achieved through the political process. Thus, the conclusion that "white flight" from a financially overburdened school system can only be remedied in this forum by proof of unconstitutional state action is now the law of the case.

22. Doc. 907 (Table A).

23. *Id.* at 1.

nent exceptions noted, and will be incorporated by reference. *Evans v. Buchanan*, 455 F.Supp. 692, 700–04. Some critical expenses that as of May were to be carried by the NCCBE will now be funded federally, as indicated earlier. The cost of in-service training related to desegregation was funded federally this year and is expected to be paid from federal funds for the 1979–80 school year. On the other hand, the settlement of the teachers' strike ended in terms that will result in a projected deficit of a combined tuition[24] and current expense deficit of $791,364[25] for the 1978–79 school year. While the existing record does not provide a clear picture of the economic impact of a recent teachers' strike, state and local salary costs for teachers are expected to increase $9,500,000 over the amount expended during the current school year, even though there will be 243 fewer teachers on the payroll.[26]

But I decline to find as a fact that the totally unmanageable deficit of $11,936,084 projected by the NCCBE for the 1979–80 school year[27] will be realized for two reasons: (1) there is a possibility that $4,277,-538, or some portion thereof, not expended by the State of Delaware for the salaries of striking teachers will be appropriated by the General Assembly to the NCCBE to aid in offsetting that projected deficit,[28] and (2)

the calculation leading to the deficit does not take into account the State's obligation, established in the secondary remedial decree and affirmed on appeal,[29] to contribute $84,209,442[30] to public education in the desegregation area.[31] Thus, $2,441,117 may be deducted from the 1979–80 deficit projection of $11,936,084, leaving a deficit of approximately $9,494,967. If the Delaware Legislature does in fact appropriate the $4,277,538 previously earmarked for the District, but unexpended because of the teachers' strike, the 1979–80 deficit is further reduced to $5,217,429. Thus, I find the NCCBE's deficit at a conclusion of the 1979–80 school year will be somewhere between $5.25 and $9.5 million, assuming that the NCCBE takes no steps to help itself through cost-cutting measures.

That bleak financial outlook notwithstanding, the Court of Appeals, in its brief reflection on the merits, has instructed in no uncertain terms, that the State does not have an obligation under the Constitution to establish a local tax cap yielding in the aggregate the revenues that would have been generated by the eleven component districts. 582 F.2d at 779–780. Further, the Court of Appeals accepts as a premise:

> that any money budgeted by the State to the Northern New Castle County school system must be used by the NCCPBE,

24. Tuition revenue is considered in conjunction with local current operating expense revenue because, but for cost of transportation, the NCCBE has chosen to budget the operation of the special schools out of current expense revenue, rather than out of tuition revenue, as was the past practice. *See* discussion *infra*; D. Exh. 20.

25. The proposed budget for the current school year put into evidence by the NCCBE shows a combined tuition and current operating expense deficit of $3,027,852. NCCSD Exh. 66 at 4. The district started operations with a nonrecurring surplus of $5,625,847, NCCSD Exh. 66 at 1, encumbered by $2,243,749 in purchase orders or a net nonrecurring surplus of $3,382,-098. Thus, the NCCBE has projected spending $6,409,950 more in local revenue funds than it expects to realize in local tax revenue in its first year of operation. The teachers' strike would reduce the 1978–79 deficit to a projected $791,364. To date, the NCCBE has not adopted a budget for the 1978 79 school year.

26. NCCBE Tax Exh. 69 at 5.

27. *Id.* at 3.

28. Doc. 902 at 115.

29. 447 F.Supp. 982, *aff'd*, 582 F.2d 750 (3d Cir. 1978).

30. Plaintiffs' Tax Exh. 2. The opinion of the secondary remedial decree made clear that "the State will be expected to continue to maintain a level of support to the desegregation area commensurate with its past funding practice. That level will be measured by the entire dollar support of the 1976–77 fiscal year or the current 1977–78 year, whichever is higher." 455 F.Supp. at 1036–37 (footnote omitted).

31. In at least one budget projection, the NCCBE projected the State's contribution at $81,768,325, NCCBE Tax Exh. 68 at 3, thereby overstating its deficit by $2,441,117.

*first*, to effect the desegregation order, and then to meet the expenses of other programs. Put another way, it is the NCCPBE's responsibility to work with the money it has by attending first to all aspects of the remedial order, and then to other aspects of the school system's expenses. The Board has much discretion in setting the priorities within the latter group, but none as to the former. [Emphasis supplied.]

\* \* \* \* \* \*

For example, and only by way of illustration, the school authorities may decide to curtail certain extracurricular school programs which fall outside the area mandated by the court's desegregation order, so as to remain within budgetary limits. If any or all of these programs need be cut completely from the budget, this will occur as a result of the *legislature's* judgment, not the court's. The legislators who passed S.B. 457 were well aware of the remedial order which will go into effect [in] September. We must assume not only their ability to compute what the mandatory expenses would be, but also their good faith in so doing. Cognizant of what the State *must* pay by way of implementing the desegregation plan before using money for other purposes, *the legislators arrived at an amount which may or may not imperil other non-Court-ordered aspects of the New Castle County school system.* As the Supreme Court stated in *Carmichael v. Southern Coal and Coke Co., supra*, '[the legislators] cannot record a complete catalogue of the considerations which moved [them] to enact [the law].' But given the nature of our political system, these legislators will most certainly receive feedback from the electors to whom they are accountable as to whether they have made the right choices. Thus, without detracting from the importance of a federal court's duty to ensure that its remedial decrees be effected properly and wholly, we suggest that there are obvious inherent political safeguards involved in this case which should be permitted to run their own course.

*Id.* at 780 (citations omitted; emphasis supplied).

Accordingly, this Court does not hold the $1.585 rate unconstitutional on the strength of the financial data alone simply by reference to the enormity of the NCCBE's deficit, most of which will be incurred by reason of the settlement of the teachers' strike that occurred subsequent to issuance of the Court of Appeals' mandate. Rather, in this context, it is the amount of local financial support relative to prior years that is relevant to the question of unconstitutional intent. The NCCBE simply has not carried the day on the data alone. The Court of Appeals having instructed that the balance be struck in the first instance here, 582 F.2d at 780, it is concluded that the NCCBE's deficit, alarming though it may be as a practical matter, does not compel a finding of unconstitutional intent on the part of the State defendants.

An examination of the financial evidence proving inconclusive, the necessity for considering other evidence of unconstitutional intent emerges. The NCCBE, as challenger of S.B. 457, bore the burden of demonstrating that intent. *Arlington Heights, supra* 429 U.S. at 267–68, 97 S.Ct. at 564, suggests several avenues of proving "whether invidious discriminatory purpose was a motivating factor" behind a challenged action: the historical background leading up to the decision or statute and legislative or administrative history are only two components. No party, however, has sought to challenge either S.B. 457 or the State Board's calculation of the rate as having been arrived at in bad faith. No direct evidence having been offered, none can be considered.

The NCCBE having failed to establish a prima facie case of the unconstitutionality of the tax rate set by the State Board pursuant to S.B. 457, it is concluded that S.B. 457 and the tax rate of $1.585 cannot be disturbed as a matter of constitutional law. There remain, however, the heated arguments propounded by all sides regarding the validity of the $1.585 tax rate under state law.

## II. Pendent State-Law Claim Respecting Special Schools

Both the plaintiffs and the NCCBE advance arguments aimed at upsetting the $1.585 rate on the ground that it violates State law. That the $1.585 tax rate established by the State Board of Education was predicated upon an assumption contrary to State law is not contested by defendants.[32] The reason for the lack of contest is clear. When the State Board of Education passed the resolution that resulted in the $1.585 tax rate, it explicitly assumed that the local cost for operation of the special schools[33] would be funded by a tuition tax; therefore that cost was not included within the $1.585 tax established for current operating expenses.[34] The Delaware tuition-tax statute, on the other hand, expressly provides that a tuition charge may be made only if a "pupil attends special classes for the handicapped operated by a district other than that in which he resides . . . ."[35] Since all the special schools are now in a single district and all "special" children reside in that district, the NCCBE argues and the State Board does not contest that the former would be in violation of the State tuition-tax law if it established or collected a tuition tax for the local cost of operation of the special schools.[36]

Having concluded that the rate does not offend federal law, however, this Court's jurisdiction to entertain a claim that the $1.585 is in violation of Delaware law can only be founded on the doctrine of pendent jurisdiction. *United Mine Workers*

---

**32.** To avoid any mischaracterization of the defendant's position on this issue, its Pre-Hearing Brief in Connection with the Tax Rate is quoted:

Although the State Board's legal position on this narrow issue is not immediately discernible, its candor is not. The State Board has consistently acted in accordance with its view that S.B. 457 was intended to incorporate known practice under which the current operating expenses for students attending special schools were funded through the tuition tax rate, even when those students attended a special school located within the district of their residence. It can be argued, however, that had the State intended to incorporate prior practice in violation of the technical requirements of the tuition law into Senate Bill 457, they were obligated to do so explicitly. Doc. 877 at 15.

**33.** Special schools identifies those schools that serve the severely physically, mentally and emotionally handicapped. The five special schools in New Castle County are exempted from the desegregation process. *Evans v. Buchanan*, 416 F.Supp. 328, 360 (D.Del.1976).

**34.** The resolution expressly provides:

NOW, THEREFORE, BE IT RESOLVED, that the State Board of Education determines that $1.585 per $100 of assessed valuation is the appropriate tax limit called for by Senate Bill 457, assuming that the local share of special schools continues within the single district to be funded by a tuition tax in accordance with 14 *Del.C.* § 1924(e) and in accordance with prior practice. State Board Tax Exh. C.

**35.** The tuition statute, 14 *Del.C.* § 604, provides:

(a) If any pupil attends special classes for the handicapped operated by a district other than that in which he resides or by an agency of the State Department of Public Instruction, the receiving district or the Department of Public Instruction shall collect a tuition charge for the nonresident pupil, provided approval for attendance has been granted by the sending district. Such tuition charge shall be paid by the school board of the reorganized school district in which the pupil is a resident from the proceeds of a local tax levied for this specific purpose.

Further, the statute expressly provides the methodology for computing the tuition tax:

(b) In determining the tuition to be charged, the receiving district or the State Department of Public Instruction shall compute the tuition by adding (1) the current year estimated expenses for salary supplements for the staff of the special classes, said salary supplements to be based on a salary supplement schedule not higher than the schedule in force in other schools in the district in which the special classes are located; and (2) other expenses attributable to operation of the special classes for which local funds are to be used in the current school year. The sum so obtained shall be divided by the total number of pupils in the special classes as of September 30 of the current school year. The resulting figure shall represent the amount of the "tuition charge" per pupil. 14 *Del.C.* § 604(b).

**36.** The NCCBE does levy a small tuition tax (2 cents) to cover cost of transportation to special schools under a statutory exception not germane to the present matter.

*v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), teaches that the exercise of pendent jurisdiction is broken down into elements of judicial power and judicial discretion. *Id.* at 725, 86 S.Ct. 1130. Judicial power exists only if the federal question is substantial enough to create subject-matter jurisdiction and if the state and federal claims arise from a "common nucleus of operative fact." *Id.* Both requirements are met here. First, S.B. 457 and the corresponding $1.585 came into existence as a direct consequence of the desegregation decrees ordered by this Court. Second, the problem of special students and special schools, in one form or another, has long been a part of this litigation.[37]

Satisfied that jurisdiction—in the sense of judicial power—exists over the pendent claim pressed by plaintiffs and the NCCBE, the Court finds the question whether judicial discretion should be exercised in favor of deciding it much more troublesome. Unlike the usual case, considerable effort has already been committed to the exploration of the state-law issue through briefing and at oral argument. As a result, judicial economy and convenience to the litigants are equivocal factors that, on balance, would suggest that this Court assume jurisdiction. *See United Mine Workers, supra.* But, the difficulties in providing a judicial remedy for the state-law claims propounded here concern both the intricacies of the state-law issue and, more significantly, the questions of comity raised by the remedies proposed. A brief exploration of the remedies suggested by the parties will reveal these sensitivities.

At the outset, the record reveals that the failure of the $1.585 tax rate to account for the cost of operating the special schools in a manner consistent with state law creates an enormous financial burden for the NCCBE. The local share of the cost of operating the five special schools is not insignificant: it is budgeted at $1,688,195 [38] for the current school year and will increase 14%[39] or to $2,363,473 for the 1979–80 school year. Because the tax yields about $250,000 for each cent of tax rate [40] these costs require 6.75 cents of the tax rate for the current school year and 9.75 cents for the 1979–80 school year. Leaving to one side a two-cent tuition tax separately assessed for transportation of special students by the NCCBE,[41] funds for operation of the special schools formerly generated by the tuition tax are approximately 4.75 cents and 7.75 cents for the current and succeeding school years respectively. As a result, approximately $1.7 million and $2.3 million for the current and following school year are being siphoned from the revenue derived from the current local operating expense tax in order to fund the operation of special schools. Thus, the NCCBE finds itself in the position of having to meet its expenses for schools other than special schools with funds deemed insufficient by all active parties to this litigation. Each of these litigants, however, urges a different method of resolution.

The State Board of Education suggests that resolving the problem should be left to the Legislature,[42] and that in the interim the NCCBE should continue the unlawful practice of charging itself tuition [43] in order

---

**37.** *See e. g. Evans v. Buchanan*, 582 F.2d 750, 779 (3d Cir. 1978); *Evans v. Buchanan*, 455 F.Supp. 692, 703 (D.Del.1978); *Evans v. Buchanan*, 447 F.Supp. 982, 1013 (D.Del.1978); *Evans v. Buchanan*, 416 F.Supp. 328, 361 (D.Del.1976) (three-judge court).

**38.** NCCBE Tax Exh. 68 at 14. The figure in the text includes the cost of transportation for which a separate two-cent tax is levied. *See* n.36 *supra*.

**39.** NCCBE Tax Exh. 69 at 2.

**40.** *Id.* at 1.

**41.** *See* n.36 *supra*.

**42.** State Board's Pre-Hearing Brief in Connection With the Tax Rate, Doc. 877 at 15.

**43.** Again, to avoid any mischaracterization of the defendant's position, a lengthy portion of its Brief is quoted:

> . . . The five special schools are the primary beneficiaries of the tuition tax levy in the desegregation area (apart from the voluntary transfer program) and as the demands on those schools increase, financially and otherwise, the new board should have the financial flexibility to meet those needs by

to finance the operation of special schools.[44] The State Board also argues that if there is to be judicial intervention, the $1.585 should be raised by one cent.

The NCCBE argues that the invalid legal premise embraced by the defendant must result in denial of a permanent injunction. It also offers an alternative calculation that would result in a tax rate of $1.61 and urges that this Court modify the tax rate in accordance with that calculation. Similarly, plaintiffs press an alternative calculation that would result in an eight-cent raise in the $1.585 rate, although they suggest a more orthodox method of reaching it: this Court should simply make a finding respecting the state-law violation and then order the State Board to recalculate the rate.

This Court declines to take jurisdiction over the claim, thereby rejecting all alternative proposals offered by the litigants, because of a strong reluctance to intrude into state-law questions of taxation, as to which the federal court as an institution possesses very little expertise and even less authority. This rule of thumb carries the greatest force, of course, when, as here, it has already been determined that the tax rate sought to be adjusted cannot be disturbed as a matter of federal law.[45] Moreover, when the Court of Appeals stated, "To the extent that the State legislature may discover that the State Board's determination of priorities in setting the rate of $1.585 . . . must be altered, it may legislate a change retroactively," 582 F.2d 750 at 779, it voiced a clear preference for resolution of entanglements such as this one by the State Legislature or appropriate State administrative bodies. I am persuaded that the wiser path is to refrain from taking jurisdiction over a dispute properly left to the political processes.

Moreover, as all parties are acutely aware, any action taken by this Court on a matter only tangentially related to the desegregation process, and as to which it possesses no federal ground of intervention, would be subject to quick correction by the Delaware Legislature, should that body undertake a revision of the applicable law. Therefore, the longevity of any federal court order respecting special schools could not in any sense be guaranteed. In the long run, an interim solution by this Court later corrected by State administrative or legislative bodies would only cause further fiscal confusion and therefore would not serve any parties' long-term interests. In short, it is very clear that the best forum for resolution of a delicate state-law question such as this is the Delaware Legislature.

The procedural posture of this proceeding dictates that, by refusing to act on the pendent claim, this Court grants a permanent injunction locking into place—at least with respect to this lawsuit—a local current operating expense tax rate that may violate state law. The terms of that injunction, however, reveal that no impropriety results from such a step. Even if the State Board has calculated a local current operating ex-

continuing to utilize the tuition levy to meet the local expense share of funding those schools.

The approach adopted by the State Board is more, not less, favorable to the new district than the opposite approach. This is so for the following reason. Under the State Board approach, which is also the understanding and approach utilized by the NCCBE (and which explains their acquiescence on this point), the new district will have the flexibility to fund the local cost of students attending special schools out of the tuition tax rate, which is unaffected by the cap provided by Senate Bill 457. If the State and NCCBE are wrong in this regard, that expense will be funded out of the current operating expense tax rate which is subject to the legislative cap. Therefore, assuming the validity of the cap, the Planning Board would not have the flexibility available under the tuition tax rate to deal with increasing costs in this sector in future years. Doc. 877 at 16 (citations omitted).

**44.** In view of this Court's decision not to act on the state-law claims, the Court does no more than register its disapproval of the State Board's suggestion, now a matter of record, that the special school dilemma be resolved by a continued violation of the Delaware tuition-tax law, 14 *Del.C.* § 604. *See* n.32 and n.43 *supra*.

**45.** *See* discussion *supra*.

pense tax rate on an assumption violative of state law, the NCCBE has directed this Court to no authority that would permit the NCCBE to take the unilateral action of correcting that error by raising the tax rate to allow the generation of revenues necessary to fund the operation of the special schools in New Castle County. If a violation exists, other remedies under state law would presumably be available to it. Accordingly, the narrow terms of the permanent injunction to be issued do not in any sense ratify or put this Court's imprimatur on a violation of State law.

It is reemphasized that nothing in this opinion should be construed as preventing or discouraging either the defendant State Board from revising its tax cap retroactively or prospectively in accordance with Delaware law or the NCCBE cap retroactively or prospectively in accordance with Delaware law or the NCCBE from seeking whatever relief may be available to it under State law to correct the state-law violation it perceives in the $1.585 rate.

This Opinion constitutes the Court's Findings of Fact and Conclusions of Law pursuant to F.R.Civ.P. 52. Submit proposed form of permanent injunction on notice within 10 days.